FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

2008 DEC 10  A 11: 24

RALPH L. DELOACH
CLERK
BY _____ DEPUTY
AT TOPEKA, KS.

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
(TOPEKA DOCKET)

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA          Case No. **08-50036-SAC**
FOR AN ORDER AUTHORIZING (1) THE
RELEASE OF SUBSCRIBER INFORMAT-
ION; (2) CELL CITE INFORMATION;
(3) PEN REGISTER AND TRAP AND
TRACE DEVICE AND (4) INTERCEPTION
OF WIRE COMMUNICATIONS TO AND
FROM T-MOBILE TELEPHONE: (913) 596-0014
(TARGET PHONE 6) BEARING INTERNATIONAL
MOBILE SUBSCRIBER IDENTITY NUMBER
(IMSI) 310260904571197

# UNDER SEAL

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ORDER AUTHORIZING (1) THE RELEASE OF SUBSCRIBER INFORMATION; (2) CELL CITE INFORMATION; (3) PEN REGISTER AND TRAP AND TRACE DEVICE; AND (4) INTERCEPTION OF WIRE COMMUNICATIONS

## INTRODUCTION

I, Douglas Garman, a Narcotics Investigator for the Topeka, Kansas, Police

Department, currently assigned to the Drug Enforcement Administration (DEA) Task

Force, Topeka Post of Duty (TPOD) as a Task Force Officer (TFO) being duly sworn,

declare and state:

1.     I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I have been a law enforcement officer in the State of Kansas since 1995. I am currently a narcotics investigator for the Topeka, Kansas, Police Department assigned to the Drug Enforcement Administration (DEA) Task Force. I am familiar with the enforcement of federal narcotics laws. My training and experience has involved, among other things, (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and the laundering and concealment of proceeds of drug trafficking; (b) surveillance; and (c) analysis of documentary and physical evidence. I have also participated in investigations and have been a case agent in charge of an investigation involving the interception of wire communications. Based on my training and experience as a Narcotics Investigator, I have become familiar with the manner in which narcotics traffickers conduct their drug-related businesses, including the methods employed by narcotics dealers to import and distribute narcotics, and their use of coded language to refer to narcotics, drug proceeds, and other aspects of narcotics trafficking. I have been personally

involved in several investigations involving the unlawful possession, manufacture, and distribution of controlled substances, including cocaine, "crack" cocaine, methamphetamine, marijuana, and money laundering.

3.     This affidavit is submitted in support of an Application for an order under Title 18, United States Code, Section 2518 authorizing the interception of communications until the attainment of the authorized objectives of this investigator or, in any event, no longer then thirty (30) days of wire communications of, **Alfonso RUBIO-AYALA, Adan MOLINA, Francisco NUNEZ, Gary HEATH, RENATO LNU** (hereinafter the "Interceptees"), and others yet unknown, concerning offenses enumerated in Title 18, United States Code, Section 2516, occurring to and from **T-Mobile telephone number (913) 596-0014 (Target Phone 6), bearing International Mobile Subscriber Identity Number (IMSI) 310260904571197. (913) 596-0014 (Target Phone 6)** is a prepaid **T-Mobile cellular telephone subscribed to Omar HERNANDEZ at the 2004 N. 51, # 6, Kansas City, Kansas. The primary user of the (913) 596-0014 (Target Phone 6) has been identified as Alfonso RUBIO-AYALA**. The authorization sought is intended to apply: (a) not only to the target telephone listed above, but to any other telephone numbers or telephones accessed through the above listed IMSI, and any other IMSI accessed through the above listed **(913) 596-0014 (Target Phone 6)** number, within the thirty (30) period

authorized; and (b) to background conversations intercepted in the vicinity of the **(913) 596-0014 (Target Phone 6)** while the telephone is off the hook or otherwise in use.

4.      There is probable cause to believe that **Alfonso RUBIO-AYALA, Adan MOLINA, Francisco NUNEZ, Gary HEATH, RENATO LNU** (hereinafter the "Violators") and others yet unknown, have committed, are committing, and will continue to commit the following offenses: possession of a controlled substance with intent to distribute, and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); conspiracy and attempt to possess with intent to distribute and distribute a controlled substance, in violation of Title 21, United States Code 846; unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses, in violation of Title 21, United States Code, Section 843 (b); continuing criminal enterprise in violation of Title 21, United States Code, Section 848; and money laundering and aiding and abetting, in violation of Title 18, United States Code, Section 1956, 1957, and 2; (hereinafter the "Subject Offenses");

5.      There is probable cause to believe that particular wire communication of the Interceptees and others yet unknown concerning the Subject Offenses will be obtained through the interception of such communications to and from **(913)**

**596-0014 (Target Phone 6)**. In particular, these wire communications are expected to concern the specifics of the Subject Offenses, including (I) the identities of the source(s) of supply, customers, participants, aiders and abettors and other co-conspirators of the Interceptees in the illegal activities, (ii) site(s) for storage of illegal drugs; (iii) dates, times, places and schemes for buying, concealing, possessing delivering, distributing, and paying for illegal drugs; (iv) the locations and items used in furtherance of the illegal activities, including weapons; (v) the existence and location records, in particular drug ledgers, associated with this activity; (vi) the nature, extent, ad methods of the criminal organization in which the Interceptees participate; (vii) the location and source of resources used to finance the illegal activities; and (viii) the subsequent concealment, distribution, and transfer of contraband and proceeds from these illegal activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the Subject Offenses; and

6. There is probable cause to believe that **(913) 596-0014 (Target Phone 6)** is being and will continue to be used by the Interceptees and others yet unknown in connection with the commission of the Subject Offenses. Expect where otherwise noted, Special Agents and Task Force Officer of the Drug Enforcement Administration (DEA), Special Agents and Task Force Officers of the Alcohol

Tobacco and Firearms (ATF) Agents from the Kansas Bureau of Investigation (KBI), Narcotics Investigators of the Topeka, Kansas, Police Department (TPD), Narcotics Investigators of the Shawnee County, Kansas Sheriff's Department (SNSO), and/or other law enforcement officers have provided the information set forth in this affidavit to me directly or indirectly. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many other statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance except where indicated, does not set forth my personal observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance. Because this affidavit is being submitted for the limited purpose of securing authorization for the intercept of wire communications, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation for an order authorizing the interception of wire communications.

**SUMMARY OF PROBABLE CAUSE**

7.     The application accompanying this affidavit seeks authority to intercept wire communications occurring to and from the user of **(913) 596-0014 (Target Phone 6 )**, which is believed to be used to facilitate the drug trafficking activities of an organization that operates its illicit business at various locations in the continental United States, including Kansas, Arizona, Colorado and Missouri. This organization is responsible for distributing methamphetamine to and within the locations with in the United States, including Topeka, Kansas, Great Bend, Kansas, and the Kansas City Metro area.

8.     There is probable cause to believe that **Alfonso RUBIO-AYALA** is utilizing **(913) 596-0014 (Target Phone 6)** in order to communicate and coordinate the distribution of methamphetamine to wholesale customers for their organizations, to include **RUBIO-AYALA's** Source of Supply (SOS) responsible for the suspected multi-pound deliveries of methamphetamine.

9.     There is probable cause to believe that **(913) 596-0014 (Target Phone 6)** is being used and will continue to be used to commit the Subject Offenses and that evidence of the commission of these ongoing offenses will be obtained through the requested interception of wire communications. The objective of the investigation is to obtain evidence of the identities and roles of participants in the Subject Offenses

as well as the manner in which the offenses are being committed.

10.    Efforts to attain the stated objective of this investigation through normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ.


## PERSONS EXPECTED TO BE INTERCEPTED

11.    **Alfonso RUBIO-AYALA**, a Hispanic male, date of birth is believed to be July 28, 1983, Social Security number is unknown, residential address is 4430 S.E. Minnesota, Topeka, Kansas. **RUBIO-AYALA** has been identified as the primary user of **(913) 596-0014 (Target Phone 6)**.   Through information received from the investigation to date, agents believe that **RUBIO-AYALA** assists **Adan MOLINA**, user of Target Phone 4, in arranging the importation/transportation of multi-pound quantities of methamphetamine from Phoenix, Arizona, to Topeka, Kansas for distribution.   **RUBIO-AYALA** then distributes portions of these pounds of methamphetamine to co-conspirators in Kansas City Metro area, Lawrence, Kansas and Topeka, Kansas.  As these co-conspirators sell the methamphetamine they pay **RUBIO-AYALA** cash monies for the methamphetamine.

A.    Computer inquires through the National Crime Information Center (NCIC) indicate that **Alfonso RUBIO-AYALA**, date of birth of July 28, 1983, has

an arrest by the Bureau of Immigration and Customs Enforcement (BICE) on March 18, 2008.  BICE related that **RUBIO-AYALA** is not in custody, and is currently undergoing deportation proceedings as an inadmissible alien.  NCIC shows no further law enforcement contact with **RUBIO-AYALA**.

12.    Investigation to date indicates that **Adan MOLINA** is a criminal associate of **RUBIO-AYALA**, and that the two work together in the distribution of multi-pound quantities of methamphetamine.  **MOLINA** has been identified as the primary user of telephone number (620) 282-2074/(620) 282-3514 (Target Phone 4).

A.    Computer inquires through the National Crime Information Center (NCIC) indicate that **Adan J. MOLINA**, date of birth of February 9, 1980, has no criminal history.  Although **MOLINA** has no criminal history, background checks revealed that **MOLINA** was detained in New Mexico, during July of 2006 following the seizure of $42,540.  **MOLINA** was later released.  Additionally, in 2006, an anonymous letter was received by the Great Bend, Kansas, Police Department that identified **Adan MOLINA**, Jesus VAZQUEZ-GARCIA and Rito VAZQUEZ-GARCIA as narcotics traffickers.  The letter stated that **MOLINA** and VAZQUEZ-GARCIA reside in Great Bend, Kansas, and conduct their illegal narcotics activities in the Topeka, Kansas, and Kansas City Metro areas.  This letter indicated that Rito VAZQUEZ-GARCIA lives at 1202 Holland, Great Bend, Kansas,

and that Jesus VAZQUEZ-GARCIA uses an alias of Jesus RUDELO-VAZQUEZ, because he is wanted in Phoenix, Arizona.

13.   The investigation to date reveals that **Gary HEATH** is a Lawrence, Kansas, area methamphetamine and illegal firearms distributor who utilizes **Alfonso RUBIO-AYALA** and **Adan MOLINA** as sources of supply for methamphetamine. The authorized interception of (620) 282-2074 and (620) 282-3514 (Target Phone 4) revealed that both **RUBIO-AYALA** and **MOLINA** have direct contact with **HEATH**, who, based on intercepted conversations, currently resides in Lawrence, Kansas, having previously resided in Topeka, Kansas.  Investigators had previously conducted controlled purchases of firearms and methamphetamine from **HEATH**. Computer inquires through the National Crime Information Center (NCIC) indicate that **Gary HEATH**, date of birth of May 24, 1958, Social Security Number: 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, has been arrested for the following charges:

A.   On December 5, 1985, **HEATH** was arrested by the Topeka, Kansas, Police Department for Driving Under the Influence of Alcohol or Drugs. This offense was dismissed.

B.   On August 21, 1986, **HEATH** was arrested by the Shawnee County Sheriff's Office for Theft.  This offense was dismissed.

C.   On September 13, 1997, **HEATH** was arrested by the Topeka,

Kansas, Police Department for Battery.  This offense was dismissed.

D.      On October 20, 1997, **HEATH** was arrested by the Topeka, Kansas, Police Department for Criminal Threat and Damage to Property.  These offenses were dismissed.

E.      On January 27, 1998, **HEATH** was arrested by the Topeka, Kansas, Police Department for Criminal Trespass.  This offense was dismissed.

F.      On March 22, 1998, **HEATH** was arrested by the Topeka, Kansas, Police Department for Domestic Battery.  **HEATH** was convicted of Domestic Battery and Violation of a Protective Order (PO) on August 18, 1998.

G.      On March 25, 1998, **HEATH** was arrested by the Topeka, Kansas, Police Department for Criminal Trespass, Driving Under the Influence of Alcohol and Drugs, Possession of Depressants, Stimulants, Hallucinogenic or Steroids and various traffic offenses.  Disposition is unknown.

H.      On January 2, 1999, **HEATH** was arrested by the Topeka, Kansas, Police Department for Possession of Opiates, Opium, or Narcotic Drugs, Possession of Depressants, Stimulants, Hallucinogens or Steroids, and Possession of a Simulated Controlled Substance or Drug Paraphernalia.  All charges were dismissed.

I.      On January 22, 1999, **HEATH** was arrested by the Shawnee County Sheriff's Office for Contributing to a Child's Misconduct.  This charge was

dismissed.

J.    On April 7, 2000, **HEATH** was arrested by the Orlando, Florida, Police Department for an out-of-state fugitive warrant from the State of Kansas. The charge was listed as Possession of Hallucinogenic Drug with Intent to Sell. The disposition of the arrest is unknown.

K.    On December 5, 2006, **HEATH** was arrested by the Riley County, Kansas, Police Department for Battery. He was acquitted of the charge.

L.    On August 16, 2008, **HEATH** was arrested by the Topeka, Kansas, Police Department for Possession with Intent to Distribute Methamphetamine. This arrest was a result of information learned by investigators through this investigation, and due to the ongoing conspiracy between **HEATH**, **RUBIO-AYALA**, **MOLINA**, and others. **HEATH**'s case has not been presented for prosecution.

14.    The investigation to date reveals that **Francisco NUNEZ** is a Topeka area methamphetamine distributor who utilizes **Alfonso RUBIO-AYALA** as a source of supply for methamphetamine. Pen Register analysis of (785) 640-1617 (Target Phone 5) reveals contact between **Francisco NUNEZ** and **RUBIO-AYALA** utilizing (785) 408-2994. Further, on November 7, 2008, an undercover agent purchased approximately 1 oz. of methamphetamine from **Francisco NUNEZ**. Surveillance

subsequent to the transaction followed **NUNEZ** from the undercover transaction location to **NUNEZ's** residence at 2045 S.E. Ohio St., Topeka, Kansas.  On that occasion, surveillance of **NUNEZ's** residence revealed a light green Hyundai Sonata bearing Kansas license # 866-BDO.  Kansas license # 866-BDO registers on a 2000 Hyundai Sonata to **Alfonso RUBIO** at 4430 S.E. Minnesota Ave., Topeka, Kansas, and had previously been associated with **Alfonso RUBIO-AYALA**.

15.    Agents have attempted to identify **NUNEZ** based on all known information that investigators have. Agents have not been able to obtain **NUNEZ's** true identity at this time. Investigators have not been able to obtain a driver's license or any other information about **NUNEZ**. Computer Inquires through the National Crime Information Center (NCIC) database have not been able to be conducted because the true identity of **NUNEZ** is unknown to investigators.

16.    Investigation to date indicates that **RENATO LNU** is a source of supply for **RUBIO-AYALA** and **MOLINA**.  Based on the authorized interception of (620) 282-2074 (Target Phone 4), investigators believe that **RENATO LNU** contacts both **MOLINA** and **RUBIO-AYALA** and has arranged the transportation of narcotics proceeds from the Topeka area back to Mexico.  **RENATO LNU** appears to be the primary user of 52-6771024949.  The context of the conversation indicates that **RENATO LNU** is physically in Mexico, and investigators have to this point been

unable to learn more about **RENATO LNU**.

## PROBABLE CAUSE FOR REQUESTED INTERCEPTION

### Background Information

17.    In June 2008, members of the Kansas Bureau of Investigation (KBI) began an investigation into the drug trafficking activities of Gary **HEATH** in Topeka, Kansas.  The KBI received information from a Cooperating Defendant (CD) about the activities of **HEATH**.  The CD was providing information to agents for a consideration of judicial leniency in pending criminal charges. The CS has provided information to agents that has been proven to be true and correct.

18.    The CD provided that he/she had been "dealing" with **HEATH** for the previous six (6) to twelve (12) months.  The CD provided that he/she would travel from Salina, Kansas, to Topeka, Kansas, to acquire four (4) to eight (8) ounces of methamphetamine from **HEATH** on each occasion. The CD stated that **HEATH** was charging anywhere from $1,650 - $1,800 per ounce, depending on the quality.  The CD also stated that **HEATH** was selling marijuana for approximately $650 per pound.  The CD stated that **HEATH** normally dealt in amounts of marijuana ranging from thirty (30) to fifty (50) pounds.  The CD also provided that **HEATH** was in possession of firearms as he collected and "moved" them as well.  The CD provided

that he/she had purchased a total of approximately twenty (20) to thirty (30) pounds of methamphetamine from **HEATH** during the past six (6) to twelve (12) months. The CD provided investigators the following telephone number for **HEATH**: (785) 408-2826 (Target Telephone 1).

19.     On June 16, 2008, members of the KBI conducted a controlled purchase between the CD and **HEATH** during which the CD paid **HEATH** $3,000 for two (2) ounces of previously "fronted" methamphetamine. **HEATH** also provided the CD with an additional five (5) ounces of methamphetamine to be paid for at a later date.

20.     On June 18, 2008, members of the KBI conducted a controlled purchase between the CD and **HEATH**. The CD repaid **HEATH** $7,500 for the previously "fronted" five (5) ounces of methamphetamine. **HEATH** also "fronted" the CD an additional two (2) ounces of methamphetamine to be paid for at a later date.

21.     On June 23, 2008, agents conducted a controlled purchase between the CD and **HEATH**. The CD repaid **HEATH** $2,000 for the previously "fronted" two (2) ounces of methamphetamine. Additionally, the CD purchased a .303 cal rifle from **HEATH** for $500.

22.     On June 26, 2008, agents conducted a controlled purchase between the CD and **HEATH**. The CD subsequently purchased a 9 millimeter Glock handgun from **HEATH** for $250.

23.     On July 8, 2008, agents conducted a controlled purchase between the CD and **HEATH**.   During this transaction, the CD purchased two (2) ounces of methamphetamine and a Mossberg shotgun for $3,000.

24.     On August 5, 2008, agents conducted a controlled purchase between the CD and **HEATH**.  During this transaction, the CD purchased approximately one (1) pound of methamphetamine from **HEATH** for $19,000.   During this purchase, surveillance by agents tentatively identified 3100 Emerson, Topeka, Kansas, as a possible stash location for **Alfonso RUBIO-AYALA**, a possible source of supply for methamphetamine for Gary **HEATH**.

**Authorized Interception of Target Phone 1**

25.     On August 11, 2008, the Hon. Richard D. Rogers, Senior United States District Judge, District of Kansas, signed an order authorizing the initial 30-day wire interception of communications to and from (785) 408-2826 (Target Telephone 1) pursuant to 18 U.S.C. Section 2518.   Target Telephone Number 1 is a T-Mobile Wireless cellular telephone which had the assigned number (785) 408-2826 and the International Mobile Subscriber Identity (IMSI) number 310260422021930, with Gary **HEATH** as the listed subscriber.

26.     Target Telephone 1 was primarily utilized by Gary **HEATH**, residing at

245 S.E. 29th, lot C-1, Topeka, Kansas. During the course of the wire interception, telephone calls between **HEATH** utilizing (785) 408-2826 (Target Telephone 1) and telephone number (785) 506-2015 (Target Telephone 2) were intercepted. Target Telephone 2 was subscribed to **Jesus AYALA**, 3100 Emerson, Topeka, Kansas, and was utilized by **Alfonso RUBIO-AYALA, a.k.a. "ANTONIO."** Based on intercepted wire communications, it appeared to investigators that **RUBIO-AYALA** was the Source of Supply (SOS) for methamphetamine for **HEATH**.

27. On August 12, 2008, at approximately 4:00 p.m., **HEATH** received an incoming call from (785) 506-2015 (Target Phone 2). During the conversation, **HEATH** said "What's up compadre?" The male caller, subsequently identified as **Alfonso RUBIO-AYALA** asked "did you do all that you can then?" **HEATH** responded, "All right, I'll be ready to see you at a quarter til five exactly. I'll make sure I'm ready." **RUBIO-AYALA** then asked, "And.....you want the same?" **HEATH** replied "Yes, please." Investigators believed the conversation to refer to a narcotics resupply.

28. A short time later, at approximately 4:40 p.m., **HEATH** called (785) 506-2015 (Target Phone 2). After greeting **RUBIO-AYALA**, **HEATH** related that he was over at his storage unit. During the aforementioned controlled purchases of methamphetamine and firearms between the CD and **HEATH**, investigators had

identified the Flex Storage at 29th and Fremont as a location at which **HEATH** kept firearms, narcotics, and cash. **HEATH** told **RUBIO-AYALA**, "everything is over here if you want to come to the storage unit, I'm here. You know where it is, right next door to the house. I have everything inside here if you want to cruise by." **RUBIO-AYALA** agreed.

29.    Pursuant to the aforementioned phone calls, surveillance was established at 3100 Emerson, Topeka, Kansas, and observed the vehicle that had been previously utilized on July 22, 2008, and on August 5, 2008, to apparently deliver methamphetamine to **HEATH**, a maroon Mercury Sable bearing Kansas license 114-AKL. Kansas license number 114 AKL lists on a 2001 Mercury Sable to **Adan MOLINA**, 2004 N. 51st St., Kansas City, Kansas. At approximately 4:59 p.m., investigators observed the Mercury Sable pull into the Live Oak Park trailer court where **HEATH** lived. At approximately 5:02 p.m., the Sable left the trailer park and went directly to back to 3100 Emerson.

30.    On August 15, 2008, at approximately 11:30 a.m., **HEATH** received an incoming call from **RUBIO-AYALA** utilizing (785) 506-2015 (Target Phone 2). **RUBIO-AYALA** left a voicemail. **RUBIO-AYALA** left the message, "Hey buddy, call me back. I have to go out of town so I wanna make sure you'll be okay. Based on the context of the conversation, investigators believed the call to be

**RUBIO-AYALA** checking on **HEATH**'s supply of narcotics.

31.    On August 15, 2008, at approximately 1:18 p.m., **HEATH** received a call from (785) 506-2015 (Target Phone 2). **RUBIO-AYALA** asked, "I want to know if you are going to be alright with 'work' (slang for narcotics) for the rest of the week?" **HEATH** responded by saying "No, I would need to hook up here. Why, are you leaving?" **RUBIO-AYALA** replied, "Yeah, I'm leaving town today. They then tentatively set a meeting for 3:30 p.m.

32.    The following summarizes one of the pertinent calls intercepted on September 30, 2008, for phone (785) 506-2015, Target Telephone 2, utilized by **ANTONIO**.

> (Call #7)  At approximately 7:07 p.m., **ANTONIO** LNU received an incoming telephone call from an unknown male (U/M) and HUGO, telephone number (816) 801-0463. The U/M told **ANTONIO** that "he" wants "Jale (work, drugs)" and that he is there with the U/M. The U/M puts HUGO on the phone and he and **ANTONIO** converse. HUGO asked **ANTONIO** if he got lost and **ANTONIO** told HUGO that he has not called him. HUGO then said he told that guy he has been "ready" since Sunday. Later, **ANTONIO** told HUGO he did not have much "Trabajo (work, drugs)," but he would put some aside for HUGO. HUGO told **ANTONIO** he had the "Billetes (bills, money)" with him and that he was ready for everything that happens. HUGO also asked **ANTONIO** if he had "Jalecillo (work, drugs)...the good one." **ANTONIO** said, "...Not right now." HUGO asked **ANTONIO** for about "two." **ANTONIO** said he would "Prestar (lend, front)" them to HUGO. **ANTONIO** said he would go to HUGO's house and go through the back. **ANTONIO** also told HUGO he was going to lend him "eleven of the other ones." HUGO stated, "Yes, no, no problem."

**ANTONIO** told HUGO he could give him more tomorrow because he does not have any "Jale (work, drugs)" prepared.  They agreed to talk more when they meet in person.  Based on training, experience, and the content and context of the call, investigators believe that **ANTONIO** and HUGO are discussing **ANTONIO** selling HUGO drugs.

33.  The following summarizes one of the pertinent calls intercepted on October 1, 2008, for phone (785) 506-2015, Target Telephone 2, utilized by **ANTONIO**.

(Call #36) At approximately 12:27 p.m., **ANTONIO** LNU received an incoming telephone call from an unknown male (U/M), telephone number (816) 801-0463.  During the conversation, the U/M asked **ANTONIO** if he was picking up the "Jale (work) or what?" **ANTONIO** told the U/M he was, but later.  The U/M told **ANTONIO** to call him.  Based on training, experience, and the content and context of the call, investigators believe that the U/M was inquiring if **ANTONIO** had picked up a shipment of drugs.

34.  The following is a summary of one of the pertinent conversations intercepted on October 5, 2008, from (785) 506-2015, Target Telephone 2, utilized by **ANTONIO**.

(Call #280)   At approximately 1:39 p.m., **ANTONIO** placed an outgoing telephone call to HUGO, telephone number (785) 207-6990.  During the conversation, **ANTONIO** told HUGO he about six or seven and then says six.  HUGO asked if they were the "ugly ones" and **ANTONIO** said they are not that bad.  HUGO told **ANTONIO** they needed the "heavy" ones.  **ANTONIO** asked, "Those good ones?" and HUGO said yes.  **ANTONIO** then told HUGO he had three, but they were "Puro Jale (good work)" but were ground up.  HUGO then spoke about the "ones" that **ANTONIO** brought him and said the work was good but ground up.  HUGO also said but they still "went out" anyway.

**ANTONIO** told HUGO they were like those but more ground up. HUGO replied, "Oh man." **ANTONIO** then said, "But it is all work, man. For real, it is work." HUGO asked if it was from the same "Jale (work)" and **ANTONIO** said it was. **ANTONIO** then said that "El Guero" would not arrive until the following day. **ANTONIO** later said if HUGO could get one or two for today and tomorrow. HUGO said he was almost dry and would be ready by tomorrow. HUGO asked how many of the regular kind **ANTONIO** had there. **ANTONIO** stated he only had about two or three. HUGO then said that **ANTONIO** had told him he had about seven and **ANTONIO** said including those he had five. **ANTONIO** said he had three "clean" one and the others are the regular kind. **ANTONIO** and HUGO continue talking for some time regarding work and money owed to them. Based on training, experience, and the content and context of the call, investigators believe that **ANTONIO** and HUGO are discussing drugs and the quality of drugs they have.

35.     The following is a summary of two of the pertinent conversations intercepted on October 6, 2008, from (785) 506-2015, Target Telephone 2, utilized by **ANTONIO**.

(Call #369)   At approximately 5:07 p.m., **ANTONIO** received an incoming telephone call from an unknown male (U/M), telephone number (785) 969-6361. **ANTONIO** complained to the U/M that he was hiding from him. The U/M stated he was on his way there because he had finished all that he had to do. The U/M later stated that the "Los billetes (bills)" were left there and that they do not answer his calls. **ANTONIO** said the boss will not forgive him one more time. The U/M stated that he is in the same position as **ANTONIO** and his boss. **ANTONIO** later stated that they would have to resolve it because he is under a lot of pressure. The U/M told **ANTONIO** they would get it settled. Based on training, experience, and the content and context of the call, investigators believe that **ANTONIO** and the U/M are discussing the collection of drug related proceeds.

(Call #380) At approximately 7:51 p.m., **ANTONIO** placed an outgoing telephone call to HUGO, telephone number (785) 207-6990. **ANTONIO** told the HUGO that someone would be arriving later that evening and if HUGO could wait until the following day. HUGO asked **ANTONIO** how much "Jale (work)" he had there and **ANTONIO** said that work was really ground up. **ANTONIO** said it was ground up but that it was "Puro jale (pure stuff). Later in the conversation HUGO told **ANTONIO** that "these guys" want large pieces. HUGO told **ANTONIO** he was more than ready. **ANTONIO** told HUGO tomorrow for sure. HUGO then told **ANTONIO**, "…half and half and the billetes (bills, money) are there…" Based on training, experience, and the content and context of the call, investigators believe that **ANTONIO** and HUGO are discussing drugs and quality of drugs they have.

36. The following is a summary of the pertinent conversations intercepted

on October 7, 2008, from (785) 506-2015, Target Telephone 2, utilized by

**ANTONIO**.

(Call #428) At approximately 11:54 a.m., **ANTONIO** placed an outgoing telephone call to HUGO, telephone number (785) 207-6990. During the conversation, **ANTONIO** asked HUGO how much he was going to want. HUGO replied, "…half and half, if it's possible." **ANTONIO** discusses what he has prepared and told HUGO, "I'm going to take you ten (10) so you can start working." HUGO replied, "Alright." Based on training, experience, and the content and context of the call, investigators believe that **ANTONIO** and HUGO are discussing the amount of drugs that **ANTONIO** will bring to HUGO.

(Call #476) At approximately 5:58 p.m., **ANTONIO** placed a telephone call to HUGO, telephone number (785) 207-6990. During the conversation, HUGO told **ANTONIO**, "…they have already protested." **ANTONIO** asked about what and HUGO said because of the "Jale (work)" and that is was really bad. **ANTONIO** told HUGO that "that thing" came in like that. HUGO said those four (4) are fine but said **ANTONIO** put too much oil on them. **ANTONIO** again stated that it

came in like that.  Later, **ANTONIO** told HUGO it did not want to fight over it.  **ANTONIO** then said that next time **ANTONIO** would give HUGO one (1) good one for the one that he lost.  Based on training, experience, and the content and context of the call, investigators believe that **ANTONIO** and HUGO are discussing poor quality drugs that HUGO had received and that **ANTONIO** told HUGO he would give him additional drugs sometime in the future to make up for the poor quality drugs he had give HUGO.

37.    **MOLINA's** telephone, (620) 282-3514, made 41 contacts to the 2015 telephone number between November 15, 2008, and November 20, 2008.

38.    In addition to telephonic contact between **RUBIO-AYALA** and **HEATH**, the interception of Target Telephone 1 revealed telephonic contact between **HEATH**, telephone number (785) 408-2826 (Target Telephone 1) and telephone number (620) 282-2074 (Target Telephone 4), which was subsequently identified as being utilized by **ADAN MOLINA**.

39.    On August 14, 2008, **HEATH** placed a telephone call to **MOLINA**, telephone number (620)282-2074 (Target Telephone 4).  **HEATH** left **MOLINA** a message saying he wanted to talk to him about "work" and was hoping to get started on that "venture."  **HEATH** also stated that he had a Beretta for **MOLINA**.  Agents believed that **HEATH** wished to speak with **MOLINA** regarding drug related activities.  Additionally, Agents believe that **HEATH** had a Beretta (firearm) available for **MOLINA**.

40. On August 16, 2008, **HEATH** received a telephone call from **MOLINA**, telephone number (620) 282-2074 (Target Telephone 4). **HEATH** told **MOLINA** he had a brand new 92-F Beretta for him. **MOLINA** told **HEATH** he was out of town. They agreed to talk when **MOLINA** returned.

41. The interception of Target Telephone 1 was discontinued on August 19, 2008, subsequent to the arrest of Gary **HEATH** and his subsequent change of telephones.

**Arrest of HEATH**

42. On August 17, 2008, intercepted communication on Target Telephone 1 indicated that **HEATH** was possibly trying to arrange for someone to cause bodily harm to an unknown individual. Surveillance units subsequently observed **HEATH** driving a vehicle and requested members of the Topeka Police Department to conduct a traffic stop of **HEATH** as **HEATH** did not have a valid driver's license. Subsequent to his arrest, officers discovered approximately five (5) ounces of methamphetamine, two (2) handguns and approximately $10,000. Subsequent to his arrest, **HEATH** discarded Target Telephone 1.

43. On August 19, 2008, the CD provided agents with **HEATH**'s new cellular telephone number: (785) 969-1421 (Target Telephone 3). On August 21,

2008, agents from the KBI placed a consensually recorded telephone call from the CD to **HEATH** at telephone number (785) 969-1421 (Target Telephone 3). **HEATH** and the CD discussed the purchase of firearms and the distribution of methamphetamine.

### Authorized Interception of Target Phone 3

44.    Based on the aforementioned events, on September 15, 2008, the Honorable Richard D. Rogers, Senior U.S. District Judge signed an order authorizing the wire communication interception of telephone number (785) 969-1421 (Target Telephone 3), which was being utilized by **HEATH**.

45.    On September 19, 2008, **HEATH** utilized Target Phone 3 to receive a call from **RUBIO-AYALA** utilizing (785) 506-2015 (Target Phone 2). **RUBIO-AYALA** asked **HEATH**, "How much paper you got?" **HEATH** told **RUBIO-AYALA** "sixteen (16), for sure," relating that **HEATH** did not have the chance to collect as much as he wanted to. Based on training, experience and the context of the call, investigators believe that the **RUBIO-AYALA** was inquiring how much narcotics related proceeds **HEATH** had for **RUBIO-AYALA**.

46.    On September 19, 2008, at approximately 3:56 p.m., **HEATH** placed an outgoing telephone call to an unknown male (U/M) utilizing telephone number 816-617-0090. The U/M told **HEATH**, "You switch phones more than I change

underwear dude." **HEATH** replied, "I know it…I love it." Based on training, experience and context of the call, investigators believe that **HEATH** and the unknown male were referring to changing telephones in order to avoid law enforcement detection.

47. From October 5, 2008, to October 10, 2008, there were no pertinent conversations intercepted over Target Phone 3, which had ceased to be active. Investigators ceased monitoring Target Phone 3, speculating that **HEATH** had discarded Target Phone 3 and had acquired a new cellular phone. As a result, interception of Target Phone 3 was terminated on October 10, 2008.

**Authorized Interception of Target Phone 2**

48. On September 30, 2008, the Honorable Richard D. Rogers, Senior U.S. District Judge, signed an order authorizing the wire communications interception of telephone number (785) 506-2015 (Target Telephone 2) which was being utilized by **Alfonso RUBIO-AYALA**.

49. During the interception of Target Phone 2, agents intercepted communications to and from the Target Telephone identifying that **RUBIO-AYALA** and co-conspirators, both known and unknown to agents, were distributing controlled substances in the Topeka and Kansas City Metro area.

50. On October 1, 2008, and October 2, 2008, agents intercepted communications between Target Phone 2 and Target Phone 5, telephone number (785) 640-1617, utilized by **Francisco NUNEZ**. The context of these communications indicated that **NUNEZ** and **RUBIO-AYALA** are co-conspirators involved in a conspiracy to distribute controlled substances and are aware of law enforcement presence.

51. On October 1, 2008, agents intercepted a communication between **NUNEZ** and **RUBIO-AYALA**. During the conversation, **NUNEZ** stated: "He says to bring it." **RUBIO-AYALA** replied: "Tell him to bring you the money then." **NUNEZ** replied: "Yes, I mean he has it all." **RUBIO-AYALA** replied "Tell him to take the paper there to you. I will be there in a minute." **NUNEZ** replied: "okay." The context of the conversation indicated to investigators that **NUNEZ** contacted **RUBIO-AYALA** to obtain additional controlled substances for a third party who had payment for a previous narcotics transaction. A later communication intercepted on the same day identified that **NUNEZ** had observed law enforcement officers near his residence and contacted **RUBIO-AYALA** to warn **RUBIO-AYALA** of the presence of law enforcement in the area. This resulted in the above mentioned transaction not being completed and being rescheduled for another date.

**Confidential Source Information**

52.     On September 25, 2008, and September 29, 2008, TFO Garman and TFO Gifford conducted a debriefing of a Topeka Police Department Confidential Source (CS), herein after referred to as CS. The CS is providing information to agents for consideration of judicial leniency on pending criminal charges. The CS has provided information to agents that have been proven to be true and correct.

53.     The CS advised that a Hispanic male known to the CS as "**JUNIOR**," was selling methamphetamine from the residence at 422 N.E. Gordon in Topeka, Kansas. The CS described "**JUNIOR**" as a Hispanic male approximately 36 years of age. The CS related that "**JUNIOR**" lived at the residence with his wife, Maria, and their kids.

54.     The Shawnee County Sheriff's Department had previously identified **Isabel PLASENCIO** as a methamphetamine distributor who resides at 422 N.E. Gordon, Topeka, Kansas, and further, that **PLASENCIO** is known by the a.k.a. of "**JUNIOR**." The CS related that **PLASENCIO** was currently utilizing the cell phone (785) 438-8599. The CS stated that **PLASENCIO's** old cell phone number was (785) 213-8827. The CS stated that a Hispanic male known to the CS as "**Ramon**" was now using **PLASENCIO's** old cell number of (785) 213-8827. The CS stated that the CS had met **Ramon** while hanging out at **PLASENCIO's** residence. The CS

believed that **Ramon** is **PLASENCIO's** uncle, and Maria's blood-uncle. Maria is

**PLASENCIO's** wife and also lives at the Gordon address with **PLASENCIO**. The

CS stated that **Ramon** was currently in Mexico and had left approximately 3 weeks

to a month earlier.

55.     The CS stated that the CS had been at **PLASENCIO's** residence when

**Ramon** loaded up an old trailer with packages to take back to families in Mexico.

The CS described the vehicle that **Ramon** drove to Mexico as a newer-yellow Dodge

Durango with black stripes believed by agents to have previously been driven by

**Alfonso RUBIO-AYALA**. The CS stated that the Dodge Durango belonged to a

friend of **Ramon's**. The CS stated that the CS was told that about 4-5 years ago

**Ramon** was attempting to cross the Mexico border and was stopped and arrested for

a warrant out of Denver, Colorado. The CS was told that **Ramon** did not go to jail

because the statute of limitations had ran out on **Ramon's** case.

56.     The CS stated that the CS had met a Hispanic male known as **Francisco**

**LNU**, subsequently identified by agents as **Francisco NUNEZ**,  while at 422 N.E.

Gordon, Topeka, Kansas. The CS stated that the CS believed that **NUNEZ** is Maria's

cousin. The CS described **NUNEZ** as a Hispanic male, approximately 45 years of

age, short and fat with a very short hair cut. The CS stated that **NUNEZ** operates his

own concrete business and that the CS had done some work for **NUNEZ** recently that

**NUNEZ** still owed the CS money for the work performed.

57.     The CS stated that **NUNEZ** still owed the CS $1600 but had been trying to pay the CS with one (1) ounce of methamphetamine.  On September 24, 2008, the CS stopped by **NUNEZ**'s residence at 2025 S.E. Ohio, Topeka, Kansas, to talk to **NUNEZ** about the money **NUNEZ** owed the CS.  **NUNEZ** provided the CS with a cell phone and told the CS that **NUNEZ** would call him later.  The CS provided the cell phone to investigators.  The cell phone was a Virgin Mobile Kyocera that utilized telephone number (785) 554-1440 (FCC ID #OVFWC-K24-2J10).  The screen of the cell phone had been broken so you could not see what numbers were on the phone. The CS stated that **NUNEZ** had a second cell phone that **NUNEZ** utilized and the telephone number was (785) 640-1617 (Target Phone 5).

58.     The CS identified the 2025 S.E. Ohio, Topeka, Kansas, residence to investigators as being **NUNEZ's** primary residence.  The CS stated that **NUNEZ** had the following vehicles:  a purple colored Plymouth mini-van, a white 4-door truck, and a couple of sport-type racing cars that he thought were Nissan 300z type cars. Investigators were able to identify the purple colored minivan as displaying Kansas registration tag XPN 603. A check of the Kansas registration tag XPN 603 identified the vehicle as a 1998 Plymouth Voyager, registered to Sara Adela ALARCON at 2025 S.E. Ohio, Topeka, Kansas.

59. A check of the City of Topeka Water Department files identified that Sara BARRAZA, date of birth of December 1, 1972, has active water service at the residence located at 2025 S.E. Ohio, Topeka, Kansas, and that a phone number given on the water billing information for 2025 S.E. Ohio registered to **Francisco NUNEZ**.

60. On September 29, 2008, investigators directed the CS to meet with **NUNEZ** in an attempt to collect the monies owed to the CS by **NUNEZ**. During the conversation the CS asked **NUNEZ** about the methamphetamine **NUNEZ** offered the CS for payment. **NUNEZ** said that "they" were waiting for drugs to come to Topeka. **NUNEZ** told the CS that the Hispanic male that had been at **NUNEZ**'s residence on September 26, 2008, driving the dark blue Dodge Pick-Up was the individual who was getting the methamphetamine for **NUNEZ**. **NUNEZ** said that the main source of supply for the methamphetamine was the owner of the yellow Dodge Durango with black stripes, believed by agents to have previously driven by **RUBIO-AYALA**.

61. **NUNEZ** told the CS that the day the CS was at **PLASENCIO's** and **Ramon** was loading the trailer to drive back to Mexico, the owner of the yellow and black Durango was at **PLACENCIO's** residence and had seen the CS. The CS was unable to identify that person.

62. **NUNEZ** also told the CS that someone had left for Denver, Colorado, from Topeka to pick up a load of methamphetamine and bring it back to Topeka. The

CS said the CS did not know who was driving to Denver to obtain the methamphetamine but believed the methamphetamine was coming back to the owner of the yellow and black Durango. **NUNEZ** told the CS that the shipment was supposed to be back in Topeka, Kansas, in a few days.

63. The following summarizes the pertinent calls intercepted on November 25, 2008, for telephone number (785) 640-1617, Target Telephone 5, utilized by **NUNEZ**.

> (Call # 402) At approximately 10:27 a.m., **NUNEZ** received a telephone call from TFO Garman, acting in an undercover capacity, utilizing telephone number (785) 969-6487. During the conversation TFO Garman asked **NUNEZ**: Can I meet you at 1:00 o'clock to do it? **NUNEZ** replied: I'll call you when I come back. The context of the conversation between TFO Garman and **NUNEZ** was in reference to previous conversations arranging a methamphetamine transaction.

> (Call # 407) At approximately 10:34 a.m., **NUNEZ** received a telephone call from **RUBIO-AYALA** utilizing telephone number (785) 506-2015. During the conversation, **NUNEZ** told **RUBIO-AYALA** that **NUNEZ** had obtained some wheels for **RUBIO-AYALA** . As the conversation continued, **RUBIO-AYALA** told **NUNEZ** that he was in Kansas City. **NUNEZ** stated: Because I'm here at work with "GUERO" (white male, referring to TFO Garman) and he also wants one (1) and one half (½) like last time. What do you think? **RUBIO-AYALA** replied: Wait until I'm done. **NUNEZ** replied: He said for two (2) "PESOS", what do you think? Would you give it to him for two (2) "PESOS"? **RUBIO-AYALA** replied: Let get done here and then I'll call you.

> (Call # 408) At approximately 10:45 a.m., **NUNEZ** placed a telephone call to TFO Garman, acting in an undercover capacity and utilizing telephone number (785) 969-6487. During the conversation, **NUNEZ**

told TFO Garman: At 2:30, that'll be fine for you? TFO Garman replied: Are you going to be ready at 2:30? **NUNEZ** replied: Yeah. TFO Garman replied: We are still doing the same thing? I'm working with like $2,000.00. **NUNEZ** replied: $2100. TFO Garman replied: I got $2,000.00. **NUNEZ** replied: Man you kill me all the time, man. The conversation between TFO Garman and NUNEZ was arranging a 1 ½ ounce methamphetamine transaction for $2,000.00.

**Introduction of an Undercover Agent**

64.    On October 2, 2008, TFO Garman, acting in an undercover capacity, met with the CS for the purpose of being introduced to **Francisco NUNEZ** in an attempt to purchase methamphetamine.    TFO Garman and the CS drove to **NUNEZ**'s residence located at 2025 S.E. Ohio, Topeka, Kansas, arriving at approximately 4:53 p.m.. TFO Garman parked in the driveway of the residence located at 2025 S.E. Ohio and observed a Silver Ford Thunderbird passenger car that displayed Kansas registration tag 133 AUW, and a white Ford truck that displayed Georgia registration tag AUB 2400. A check of the Kansas registration tag 133 AUW identified the vehicle as a 1997 Ford 2-door, registered to Francisco MARIN at 513 S.E. Leland, Topeka, Kansas. A check of the Georgia registration tag AUB 2400 identified the vehicle as a 2000 Ford registered to Francisco Rocha **NUNEZ** at 2141 Newton, Gainesville, Georgia.

65.    TFO Garman and the CS walked to the detached garage at the residence

located at 2025 S.E. Ohio where TFO Garman was introduced to **"Francisco"** identified as **Francisco NUNEZ, "Francisco Jr.,"** identified as **Francisco MARIN**, and **MIGUEL LNU**. All three (3) of the individuals were sitting inside the garage with the drive through garage door open drinking Bud Light beers. TFO Garman was offered a chair and sat with the three (3) individuals and the CS.   During casual conversation TFO Garman learned that **MARIN** and **MIGUEL LNU** consumed marijuana and methamphetamine. It was obvious to TFO Garman that all present were at least aware of the distribution of methamphetamine in which **NUNEZ** was involved, if not active participants themselves.

66.     During this time, **NUNEZ** stepped from the garage and spoke on his cell phone to an unknown person in Spanish. TFO Garman learned through casual conversation that the police had been at **NUNEZ's** residence in the recent past and had asked to search the residence and that **NUNEZ** had allowed the police to search his residence because he did not keep any methamphetamine at his residence. **NUNEZ** indicated after his telephone conversation that his "friend" said that the police were at that time near his friend's residence.

67.     After approximately twenty (20) to twenty-five (25) minutes TFO Garman asked to speak to **NUNEZ** alone. TFO Garman and **NUNEZ** stepped out of the garage to the front of **NUNEZ's** white Ford truck. TFO Garman explained to

**NUNEZ** that the CS has indicated that **NUNEZ** and TFO Garman could possibly do business together, referring to distributing methamphetamine. **NUNEZ** agreed that TFO Garman and **NUNEZ** could do business and that **NUNEZ** wanted cash money for his product. TFO Garman explained to **NUNEZ** that TFO Garman had recently obtained some bad product and was having a hard time distributing the product, thus TFO Garman was not in a position to purchase methamphetamine from **NUNEZ** for a week or two. **NUNEZ** agreed and stated that he did not want to distribute methamphetamine for at least a week because of the police recently being at his residence.

68.    TFO    Garman    questioned    **NUNEZ**    about    the    amounts    of methamphetamine **NUNEZ** could or would distribute, and specifically asked about ounce quantities.    **NUNEZ** said that he would distribute ounce quantities of methamphetamine    and    that    he    wanted    $1600.00    for    a    single    ounce    of methamphetamine. TFO    Garman    remarked    about    the    high    price    for    the methamphetamine and asked about the quality of the methamphetamine. **NUNEZ** explained that it was good quality, uncut methamphetamine, and was large pieces.

69.    TFO Garman asked about getting two (2) or four (4) ounces of methamphetamine at a time if the quality was good and what the price would be. **NUNEZ** discussed the price for four (4) ounces of possibly being $4,000.00 but did

state that he would have to talk to his partner, indicating that **NUNEZ** was not acting alone as a methamphetamine distributor.

70.    **NUNEZ** did assure TFO Garman that TFO Garman would be satisfied with the quality of the methamphetamine and that TFO Garman should let **NUNEZ** know if TFO Garman was not satisfied with the quality of the methamphetamine. **NUNEZ** stated that he did not want to do any narcotics transactions at his residence because the police had been there and TFO Garman agreed. **NUNEZ** went on to state that he had another residence rented where he stored his methamphetamine for distribution to avoid detection by law enforcement.

71.    **NUNEZ** provided TFO Garman with the cellular telephone number (785) 640-1617 (Target Phone 5) as **NUNEZ's** telephone number for TFO Garman to call to arrange the purchase of methamphetamine. **NUNEZ** went to the driver's door of his white Ford truck with Georgia registration tag AUB 2400, and obtained and provided TFO Garman with a red business card. The business car was for *Durango Concrete Construction*, identifying **Francisco NUNEZ**; cell number 640-1617; home number 232-4024; and residential address of 2025 S.E. Ohio Ave., Topeka, Kansas, 66607.

72.    **NUNEZ** told TFO Garman to keep the business card to have in case anyone questioned why TFO Garman had **NUNEZ's** telephone number. TFO

Garman confirmed **NUNEZ's** telephone number had area code 785 and **NUNEZ** stated that it did. TFO Garman utilized an undercover telephone and called **NUNEZ** to confirm the telephone that **NUNEZ** possessed was the (785) 640-1617 (Target Phone 5) telephone and to provide **NUNEZ** with TFO Garman's telephone number. In the presence of TFO Garman **NUNEZ's** telephone on his person rang after TFO Garman called telephone number (785) 640-1617 (Target Phone 5).

73.    **NUNEZ** stated that he had just spoken to his partner and his partner had told **NUNEZ** that the police were around his partner's residence as well. TFO Garman asked **NUNEZ** about purchasing cocaine as well as methamphetamine. **NUNEZ** stated that he obtains cocaine sometimes but that it sells really fast and that when he obtains cocaine it's normally gone within a day or so.

74.    TFO Garman agreed to contact **NUNEZ** the following week to discuss arranging a methamphetamine transaction. TFO Garman and **NUNEZ** went back to the garage where TFO Garman had casual conversation with the others present. TFO Garman and the CS left the residence approximately five (5) minutes later.

**Undercover Agent Contact with Target Phone 5**

75.    Between October 13, 2008, and October 15, 2008, TFO Garman, acting in an undercover capacity, contacted **NUNEZ** by calling telephone number (785)

640-1617 (Target Phone 5). TFO Garman made contact with **NUNEZ** during the course of this three (3) day period several times in an attempt to arrange an undercover purchase of methamphetamine. Through conversation with **NUNEZ**, TFO Garman learned that **NUNEZ** had traveled to Denver, Colorado, to obtain a shipment of methamphetamine and return to Topeka, Kansas. **NUNEZ** agreed to distribute methamphetamine to TFO Garman indicating that TFO Garman would have to wait until **NUNEZ** returned to Topeka, Kansas, from Denver, Colorado. **NUNEZ** initially planned on returning to Topeka, Kansas, on or before October 14, 2008, but was delayed because of heavy rains and bad weather indicating that Interstate 70 near the Kansas-Colorado border was closed. **NUNEZ** commented on the quality of the methamphetamine that **NUNEZ** was going to be transporting to Topeka, Kansas, as being very good. **NUNEZ** told TFO Garman that **NUNEZ** would arrive in Topeka, Kansas, during the evening or nighttime hours of October 15, 2008, and that **NUNEZ** would distribute methamphetamine to TFO Garman on October 16, 2008.

76.     On October 16, 2008, TFO Garman, acting in an undercover capacity, contacted **NUNEZ** by calling Target Phone 5 and arranged to meet with **NUNEZ** at his residence located at 2025 S.E. Ohio, Topeka, Kansas, to arrange a purchase of methamphetamine.

77.     TFO Garman met with **NUNEZ** in the driveway of his residence.

Page 38 of 106

**NUNEZ** explained to TFO Garman that **NUNEZ** had arrived in Topeka, Kansas, during the evening of October 15, 2008, from Denver, Colorado, with a shipment of methamphetamine. **NUNEZ** related to TFO Garman that **NUNEZ** had transported five (5) pounds of methamphetamine from Denver, Colorado, to Topeka, Kansas.

78.    **NUNEZ** agreed to sell TFO Garman one (1) ounce of methamphetamine explaining the **NUNEZ** had two (2) different qualities of methamphetamine. The most recent shipment of methamphetamine was of high quality and would cost TFO Garman $2,000.00 per ounce. **NUNEZ** went on to explain that he had access to methamphetamine from a prior shipment that was of good quality but not as good as the newest shipment and would cost $1300.00 per ounce.

79.    **NUNEZ** explained that the best quality methamphetamine had not been removed from the hidden compartment in the vehicle that **NUNEZ** transported it in and was not at the time available for distribution. **NUNEZ** explained that he and his partner were going to remove the methamphetamine from the load vehicle that evening.

80.    **NUNEZ** offered to allow TFO Garman to ride with **NUNEZ** to Denver, Colorado, when **NUNEZ** obtained the next shipment of methamphetamine stating that **NUNEZ** usually travels every two (2) weeks to obtain a shipment of methamphetamine. **NUNEZ** identified his Source of Supply (SOS) as his brother

in-law and indicated that he obtains the methamphetamine directly from Mexico. **NUNEZ** stated that he obtains the methamphetamine for $12, 000.00 per pound, and offered TFO Garman the opportunity to purchase the methamphetamine at the same price, but stating that TFO Garman could not purchase the methamphetamine directly from **NUNEZ's** SOS.

81.    TFO Garman expressed concern about transporting large amounts of methamphetamine from Denver, Colorado, to Topeka, Kansas, and the risk of being detected by law enforcement. **NUNEZ** indicated that **NUNEZ** had a passenger car with a hidden compartment and that **NUNEZ** drove slow while transporting the methamphetamine to Topeka, Kansas.

82.    TFO Garman agreed to purchase the one (1) ounce of lower quality methamphetamine from **NUNEZ** for $1300.00. **NUNEZ** stated that he would contact his partner to obtain the methamphetamine. **NUNEZ** attempted to make a telephone call to his partner by utilizing Target Phone 5 and no contact was made. **NUNEZ** indicated that his partner was probably still sleeping. **NUNEZ** stated that he has a separate residence rented where the methamphetamine is stored and that he would have to go and obtain the methamphetamine. TFO Garman and **NUNEZ** agreed to meet later in the day to conduct the methamphetamine transaction.

83.    Agents attempted to conduct surveillance of **NUNEZ's** actions, however

were unsuccessful in identifying the location where **NUNEZ** went to obtain the methamphetamine.

84.     **NUNEZ** and TFO Garman had telephone contact on Target Phone 5, and **NUNEZ** indicated that he had left his key to the stash location in a different vehicle and that **NUNEZ** was going to have to wait until his partner traveled from the Kansas City area to Topeka, Kansas, so that **NUNEZ** could access the methamphetamine.

85.     Later in the day, TFO Garman and **NUNEZ** had additional conversations on Target Phone 5, and arranged the methamphetamine transaction. **NUNEZ** met with TFO Garman in a public parking lot in Topeka, Kansas, and distributed one (1) ounce of methamphetamine to TFO Garman. **NUNEZ** only charged TFO Garman $1200.00 for the ounce of methamphetamine because of the time it took **NUNEZ** to access the methamphetamine.

86.     On November 7, 2008, TFO Garman, acting in an undercover capacity, purchased approximately 1 oz. of methamphetamine from **Francisco NUNEZ**. Surveillance subsequent to the transaction followed **NUNEZ** from the undercover transaction location to **NUNEZ's** residence at 2045 S.E. Ohio St., Topeka, Kansas. Upon arrival at **NUNEZ's** residence, investigators observed a light green Hyundai Sonata, bearing Kansas license # 866-BDO. Kansas license # 866-BDO registers on a 2000 Hyundai Sonata to **Alfonso RUBIO** at 4430 S.E. Minnesota Ave., Topeka,

Kansas, and had previously been associated with **Alfonso RUBIO-AYALA**.

## Authorized Interception of Target Phone 4

87.    On October 29, 2008, the Honorable Richard D. Rogers, United States Senior District Judge, District of Kansas, signed an order authorizing the interception of communications  to and from (620) 282-2074 (Target Telephone 4). Target Telephone 4 is an Alltel cellular telephone with assigned number (620) 282-2074, bearing the Electronic Serial Number (ESN) A0000002599C85. The primary user of this phone had been identified as **Adan MOLINA**.  The subscriber for the target phone is Maria G. Vazquez, 2111 Monroe St., Great Bend, Kansas.

88.    On October 29, 2008, **MOLINA** utilized (Target Telephone 4) to call **Alfonso RUBIO-AYALA** at telephone number (785) 408-2994.  During the conversation, **MOLINA** told **RUBIO-AYALA** that he spoke to the girl and that she has girlfriend who has a license, car and kids and she may take "it" close to the ranch, "where I'm at."  **RUBIO-AYALA** said they can pay for that work and take it. **MOLINA** later said that if we get "it" from there, there will not be much trouble because they can go to the ranch.  Based on training, experience and context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing the shipment of drugs.

89.     On October 30, 2008, **MOLINA** utilized Target Phone 4 to call **RUBIO-AYALA** at (785) 408-2994.  During the conversation, **RUBIO-AYALA** related to **MOLINA** that the "Guero" (Spanish slang for 'white man') was on his back.   **MOLINA** asked how much **RUBIO-AYALA** put in after all and **RUBIO-AYALA** said, "Nine."  **MOLINA** later asked **RUBIO-AYALA** how many he gave the "Guero."   **RUBIO-AYALA** said he wanted twenty something and he planned on giving him twenty four (24).   **RUBIO-AYALA** said he had twenty five (25) but he had given one (1) to "PELON."   **RUBIO-AYALA** said he would give the "faggot" the rest.  **MOLINA** asked **RUBIO-AYALA** if the guy had given him the money.  **RUBIO-AYALA** said he was going to see him and that if the individual did not give **RUBIO-AYALA** the money, then **RUBIO-AYALA** would not give him anything.  Based on training, experience and context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing the distribution of drugs and the collection of drug related proceeds.

90.     On October 30, 2008, **MOLINA** received a call on Target Phone 4 from **RUBIO-AYALA** utilizing telephone number (785) 408-2994.  **MOLINA** asked what the "guys down there" said.  **RUBIO-AYALA** stated he had talked to the "Guero" and that "at eight (8) it's good."  **RUBIO-AYALA** then related that the "guero" could do "a hundred a week."  **MOLINA** told **RUBIO-AYALA** he was going to talk with

a buddy from the ranch who "had the same move that "Pollo" had but was taking it to Minnesota or somewhere over there."   **MOLINA** and **RUBIO-AYALA** then discussed receiving "three hundred (300) every fifteen (15) days or month." **MOLINA** asked **RUBIO-AYALA** about how many would fit in the speakers of his vehicle. **RUBIO-AYALA** said some would fit in each side but did not know exactly how many would fit.   Based on training, experience and context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing drug prices, and amounts, possibly of marijuana, and were discussing the possibility of arranging a new drug connection where they would receive a set amount once or twice per month.  The "Guero" referred to as a potential customer is believed by investigators to be **Gary HEATH**.

91.    On October 30, 2008, **MOLINA** received an incoming telephone call from **RUBIO-AYALA** utilizing phone number (785) 408-2994. **RUBIO-AYALA** told **MOLINA** that the aunt and niece called him with a job.  **MOLINA** asked if it was good work and **RUBIO-AYALA** said, "It's good.  I mean it was cut, but the guy said it was no problem." **MOLINA** asked if it was sixteen (16) and **RUBIO-AYALA** said, "Yeah." **MOLINA** then asked if it was worked and **RUBIO-AYALA** said yes and then no.   **MOLINA** asked if the guy has any that are not cut and **RUBIO-AYALA** said they sent it to him like that.  Based on training, experience and

context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing the quality of drugs, the term "worked" referring to the amount of "cut" added to the drugs.

92.     On October 31, 2008, **MOLINA** received a call utilizing (Target Phone 4) from **RUBIO-AYALA** utilizing telephone number (785) 408-2994. **RUBIO-AYALA** told **MOLINA** he was going to take two (2), one (1) and (1). **MOLINA** asked **RUBIO-AYALA** about what he and those buddies saw. **RUBIO-AYALA** said they are fine and it's just work. **RUBIO-AYALA** then said they can separate out all the cut which he thinks the "guy" put in there in a rush. **RUBIO-AYALA** also said "the buddy had like one and a quarter (1 ¼) and one (1) came from that." They then discussed the quality of the "work" and **RUBIO-AYALA** told **MOLINA**, "They are like the one you bring." **MOLINA** discussed mixing "the one with the mark and the other one together." **RUBIO-AYALA** asked if he should, "…mix them and then…throw in the eighteen (18) all together or what?" **MOLINA** said, "Yeah." Based on training, experience and context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing the preparation of drugs they had received for further distribution.

93.     On October 31, 2008, **MOLINA** received a call on Target Phone 4 from **RUBIO-AYALA** utilizing telephone number (785) 408-2994. **RUBIO-AYALA** told

**MOLINA** that "the buddy here called and said the 'Jale (work)' is bad and that the guy does not like it." **MOLINA** asked, "Which one?" **RUBIO-AYALA** said it was "the buddy who gets 'Jale (work)' by the shit load." **RUBIO-AYALA** continued to say that the guy said, "…I am taking out a bunch of cut, I am least taking a one and a half from each bag." **RUBIO-AYALA** told **MOLINA** that when **RUBIO-AYALA** mixed them, "it did not turn out well." **MOLINA** asked if he mixed it well and how many he threw in. **RUBIO-AYALA** told **MOLINA** that he had done what **MOLINA** instructed, "eight (8) and eight (8)." **RUBIO-AYALA** said "they are now pestering" him about it. They continue to discuss the quality of the drugs. **MOLINA** suggested "give them to the 'Guero' and see if he complains." Based on training, experience and context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing the quality of drugs they had previously sold to another individual who was complaining to **RUBIO-AYALA**.

94. On November 1, 2008, **MOLINA** received a call utilizing (Target Phone 4) from **RUBIO-AYALA** utilizing phone number (785) 408-2994. During the conversation **RUBIO-AYALA** told **MOLINA** that the buddy from Denver said he had another contact that may be able to send them for **MOLINA** at five and a half. **MOLINA** replied "That's good, if they get them at eight." **RUBIO-AYALA** said he thought the "Guero" would take them. The call appeared to investigators to be a

follow-on call to the previous one during which **RUBIO-AYALA** appeared to be attempting to set up a new source of supply, possibly for marijuana.

95.    On November 2, 2008, **MOLINA** received a call on Target Phone 4 from **RUBIO-AYALA** utilizing telephone number (785) 408-2994 during which **RUBIO-AYALA** told **MOLINA**, "the buddy just called and needs one (1)." **RUBIO-AYALA** also told **MOLINA** that he told the "buddy" that he had the same ones. **MOLINA** told **RUBIO-AYALA** that, "…the thing is good, just that the other was better, right?" **RUBIO-AYALA** said "yes and they don't always come out the same." Later, **RUBIO-AYALA** told **MOLINA** that the guy went to find **PLASENCIO**. **MOLINA** asked who that was, and **RUBIO-AYALA** said "**JUNIOR**, the one that hung with BOLITA." **RUBIO-AYALA** said they "fucked him with eight (8)." Based on training, experience and context of the call, investigators believe **MOLINA** and **RUBIO-AYALA** were discussing an individual that was looking to obtain a quantity of drugs, and further, made reference to Isabel **PLASENCIO's** narcotics trafficking activities.

96.    On November 2, 2008, **MOLINA** utilized Target Phone 4 and placed a call to **RUBIO-AYALA** utilizing telephone number (785)-408-2994. **MOLINA** asked **RUBIO-AYALA** if "TACO" would still do "these." **RUBIO-AYALA** said he said he would but he does not have anymore of the "Jale (work)." **MOLINA** told

**RUBIO-AYALA** that there was a guy that has about two (2) or three (3). **RUBIO-AYALA** told **MOLINA** to bring them and **MOLINA** replied, "Alright then." Based on training, experience and context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing **MOLINA** bringing a quantity of drugs with him to a future meeting with **RUBIO-AYALA**.

97.    On November 3, 2008, Agents and Officers from DEA Topeka Post of Duty, Shawnee County Sheriffs Office, Topeka Police Narcotics Unit and Kansas Bureau of Investigation conducted a surveillance in Topeka, Kansas, reference aforementioned intercepted call, which indicated that **MOLINA** intended to travel from his residence in Great Bend, Kansas, to meet with **Alfonso RUBIO-AYALA** in Topeka, in furtherance of the narcotics distribution conspiracy. At approximately 4:40 p.m., investigators observed the Maroon Mercury, bearing Kansas license # 114 AKL, arrive at the residence at 3100 Emerson, Topeka, Kansas. This vehicle was believed by investigators to have been driven by **Adan MOLINA**. A short time later, at approximately 4:47 p.m., investigators observed two subjects walking to the maroon Mercury. The Mercury then left the residence. Surveillance followed the vehicle to the *Cortes Al Gusto Meat Market* (Restaurant) at 1016 S.E. 6th Street. At approximately 5:22 p.m., the Mercury Sable was observed by surveillance to leave the restaurant southbound on Branner, ultimately arriving at 3100 Emerson. While

the Sable was still traveling to 3100 Emerson, a call was intercepted between **MOLINA** and **RUBIO-AYALA** which indicated to investigators that **RUBIO-AYALA** and **MOLINA** had still not met and were going to get together. At approximately 17:26 p.m., surveillance observed a light green car bearing Kansas license # 866-BDO, previously associated with **RUBIO-AYALA**, to arrive at 3100 Emerson.

98.     At approximately 6:30 p.m., investigators observed the Mercury Sable leave 3100 Emerson and proceed to 2025 S.E. Ohio, the previously identified address for Francisco **NUNEZ**.

99.     On November 4, 2008, **MOLINA** received a call on Target Phone 4 from **RUBIO-AYALA** utilizing telephone number (785) 408-2994. **MOLINA** told **RUBIO-AYALA** that **MOLINA** was with "**GARY**," believed by investigators to be **Gary HEATH**. They discussed how nice **HEATH's** residence is. **RUBIO-AYALA** told **MOLINA** to tell the dude to rent it and that he has a friend that rents them, further relating that they should have a "GUERO (white/fair skinned female)" rent it. Based on training, experience and context of the call, investigators believed that **MOLINA** and **RUBIO-AYALA** were discussing the possibility of using an unknown white female to acquire a rental house on their behalf.

100.    On November 6, 2008, **MOLINA** received a call on Target Phone 4

from **RUBIO-AYALA** utilizing telephone number (785) 408-2994 . **RUBIO-AYALA** asked **MOLINA** if he had left him "thirty," to which **MOLINA** replied, "Yeah." **MOLINA** asked what "the 'guero' had to say," to which **RUBIO-AYALA** replied that he had not called. **MOLINA** said, Let's crunch the numbers altogether, man. He wants to pay separately, but do the numbers altogether, twenty-four (24)." Based on training, experience and context of the call, investigators believed that **RUBIO-AYALA** and **MOLINA** were discussing amounts of drugs and the collection of drug related proceeds.

101. On November 9, 2008, **MOLINA** received a call from Mexican telephone number 52-6771024949, a number previously identified as being utilized by an individual known to investigators only as "**RENATO**." **RENATO** asked **MOLINA** if "they" had called him and **MOLINA** replied, "No." **RENATO** told **MOLINA** he should be calling him soon. **MOLINA** told **RENATO** he would give him the money and **RENATO** said, "Alright." Based on training, experience and context of the call, investigators believe that **MOLINA** would be providing drug related proceeds to an unknown individual.

102. On November 9, 2008, **MOLINA** received a call on Target Phone 4 from "BETO", utilizing telephone number 323-841-7134. BETO told **MOLINA** he was **RENATO's** friend, further relating that BETO was in Wichita, Kansas.

**MOLINA** asked BETO if he could bring "it" to him tomorrow and asked what time BETO would be leaving. Based on training, experience and context of the call, investigators believed that **MOLINA** was arranging to drop narcotics proceeds off to BETO to be subsequently delivered to **RENATO**.

103. On November 10, 2008, **MOLINA** received a call on Target Phone 4 from the individual identified previously as "**RENATO**." **MOLINA** related to "**RENATO**" that **MOLINA** was on his way "to meet the guy." **MOLINA** asked, "Do I give it him just like that, "Pelon (bold/bare/empty)." **RENATO** told **MOLINA** to take it and that he (**RENATO**) would take care of it over there. **MOLINA** replied, "Alright. Then I'm going to give him…what?" **RENATO** replied, "The thirty (30), right?" They then discuss providing the individual (presumably BETO) with additional money for the trip. Based on training, experience and context of the call, investigators believed that **MOLINA** and **RENATO** were discussing **MOLINA**'s dropping off drug related proceeds to a courier.

104. At the directions of agents monitoring Target Telephone 4, during the evening of November 10, 2008, DEA agents in Wichita, Kansas, conducted surveillance and observed the maroon Mercury Sable, bearing Kansas license # 114-AKL, arrive in Wichita and subsequently meet with an individual in Wichita. Agents maintained surveillance of the individual subsequent to his meeting with

**MOLINA** and conducted an interdiction stop of the individual.  Investigators identified the individual as **Gilberto MARTINEZ-VILLA**, and recovered $30,000 in U.S. currency from **MARTINEZ-VILLA**.  Investigators further identified a woman accompanying **MARTINEZ-VILLA**, **Maricelo MARTINEZ-LUCERO** as being involved.  **MARTINEZ-LUCERO** identified herself to investigators as **MARTINEZ-VILLA's** daughter.  The obvious drug proceeds were seized, and both **MARTINEZ-LUCERO** and **MARTINEZ-VILLA** were released.

105.   On November 10, 2008, at approximately 5:49 p.m., **MOLINA** received an incoming telephone call from **RENATO**, Mexican telephone number 52-6771024949.  **RENATO** told **MOLINA**, "...this guy got stopped at the bus place."  **MOLINA** replied, "What the fuck?"  **RENATO** said, "Yes, and his daughter was with him and she was also...who knows what the fuck...  No...where did you give him the money, right there or what?"  **MOLINA** told **RENATO** he gave him the money in the car.  **RENATO** said, "Well, they detained him, and the girl was sent to immigration because she doesn't have papers...He told them the money was his daughter's and brother-in-law's savings..."  **MOLINA** asked **RENATO** why they checked him.  **RENATO** said he was stopped getting on the bus.  **RENATO** later said, "It's too much.  If there would have been a crack from here they would have gotten you too."  **MOLINA** said, "I guess, no?  How would they know there was

money?" **MOLINA** appeared to be concerned about the courier and **RENATO** said,

"Hm, well, I don't think so because his family is really afraid here, man." Based on

training, experience and context of the call, investigators believe **MOLINA** and

**RENATO** were discussing **Gilberto MARTINEZ-VILLA**, who was detained during

aforementioned seizure of $30,000 earlier in the day in Wichita, Kansas.

106.    On November 11, 2008, **MOLINA** utilized Target Phone 4 to call

**RUBIO-AYALA** at (785) 408-2994 and asked **RUBIO-AYALA** how much "paper"

**RUBIO-AYALA** had.   **RUBIO-AYALA** told **MOLINA** he had eighty (80), more

or less.   **RUBIO-AYALA** then said he had sixty six (66) right now and the buddy is

going to pay for the sixteen (16) he had lent him.   **MOLINA** said, "And then I think

that Chica is ready too because he/she was collecting a ninety (90) yesterday."

**RUBIO-AYALA** later said he would have eighty one (81) for **MOLINA**.   Based on

training, experience and context of the call, investigators believe that **MOLINA** and

**RUBIO-AYALA** were discussing the collection of drug related proceeds, likely

$81,000.

107.    On November 11, 2008, **MOLINA** utilized Target Phone 4 to call

**RENATO**. **MOLINA** asked **RENATO** what their friend had to say and **RENATO**

said, "He told them that…that…it belonged to a friend who asked him to buy

something for him…that he was going to buy something here." **RENATO** later told

**MOLINA** "They didn't give him back the card that had your number on it man." **RENATO** also said they gave him everything back but that card. **RENATO** said they were going to confiscate the money and that they would send him something to the address here. **RENATO** later made reference to a pillow being taken as well. **RENATO** also told **MOLINA**, "That's why you have to change that fucking number. You broke it already?" **MOLINA** said, "Let's see what happens." They then discussed their suspicions about the stop. **RENATO** said, "He says they got him off, just him, and they took his boot off and everything else." **MOLINA** told **RENATO**, "They guy should have said, "Well, I don't know anything about this money, right?" **RENATO** later said, "They gave him a paper…something like a receipt that he had been there and all that. And then he's going to get another paper over here in Rodeo." **MOLINA** said, "Well…I think it's strange they came to him like that. Unless the buses are hot." **RENATO** replied, "They may be hot…if they got some shit there or something." At the end of the conversation **MOLINA** told **RENATO**, "…I'll call you if I get another number to see what's up" and **RENATO** said, "No. throw it out…" Based on training, experience and context of the call, investigators believe that **MOLINA** and **RENATO** were discussing **Gilberto MARTINEZ-VILLA**, who was stopped by Agents in Wichita on November 10, 2008, resulting in the seizure of $30,000. **RENATO** further appeared to be

encouraging **MOLINA** to change his telephone due to law enforcement's knowledge of the number.

108.   On November 11, 2008, at approximately 6:00 p.m., **MOLINA**, utilizing Target Phone 4, received an incoming telephone call from **RUBIO-AYALA**, utilizing telephone number (785) 408-2994. During the conversation, **RUBIO-AYALA** said, "Hey, what the fuck with **RENATO**...to change the fucking number." **MOLINA** replied, "Really?" **RUBIO-AYALA** said, "Yeah.  To change the number because they were asking our friend too many questions about your number." **RUBIO-AYALA** told **MOLINA**, "Throw it out.  Change it."  Based on training, experience and context of the call, investigators believe that **MOLINA** and **RUBIO-AYALA** were discussing **MOLINA**'s changing cellular telephones subsequent to the interdiction stop of **Gilberto MARTINEZ-VILLA** on November 10, 2008.   The call further indicates direct conversation between **RENATO** and **RUBIO-AYALA**.

109.   On November 12, 2008, at approximately 12:26 p.m., **MOLINA** placed an outgoing telephone call to an unknown number.  The call was an automated recording telling the user to hold while the phone is being activated.  Based on training, experience and context of the call, investigators believed that **MOLINA** was activating a new cellular telephone.  This was confirmed later in the day.  **MOLINA**

changed his telephone number to (620) 282-3514, but maintained the same Electronic

Serial Number (ESN), allowing agents to continue monitoring this telephone.

110.    The following is a summary of two of the pertinent conversations

intercepted on November 23, 2008, from (620) 282-3514, Target Telephone 4,

utilized by **ADAN**.

> (Call #810)  At approximately 2:14 p.m., **ADAN** received a telephone
> call from **RUBIO-AYALA**, telephone number (785) 506-2015.
> **RUBIO-AYALA** told **ADAN** he was going to take some of the "girls"
> from over there for a ride.  **ADAN** asked, "So that would make what,
> five (5)?"  **RUBIO-AYALA** said, "Yeah."  **ADAN** said, "Alright. The
> shit's going strong isn't it?"    They discuss "Guero" and
> **RUBIO-AYALA** said he paid for the ones **RUBIO-AYALA** gave him
> the other day.  **ADAN** asked, "The twelve (12)?"  **RUBIO-AYALA**
> said, "Yes, he paid me just now."  They later discuss the "buddy" and
> **ADAN** asked if two (2) have been given to him.  **RUBIO-AYALA** said,
> "It's already two (2), yes."  Based on training, experience, and the
> content and context of the call, investigators believe that **ADAN** and
> **RUBIO-AYALA** are discussing amounts of drugs sold to others.

> (Call #831)  At approximately 9:36 p.m., **ADAN** placed an outgoing
> telephone call to **RUBIO-AYALA**, telephone number (785) 506-2015.
> **ADAN** asked if the work is going out good and **RUBIO-AYALA** said
> the work is good.  **ADAN** said, "…We can do another more or less ones,
> it'll yield more, but we'll struggle more too." **RUBIO-AYALA** said the
> buddy was happy but he asked him why does not pay more.  They
> discuss **ADAN** giving someone another twelve (12).  **RUBIO-AYALA**
> said, "No, but I am talking about the other "Jale (work)," that of the
> green cars…the green car…"  **ADAN** said, "Okay, okay, okay."  **ADAN**
> and **RUBIO-AYALA** also discussed sending "papers" to Mexico and
> that **ADAN** wanted to send ten (10). Based on training, experience, and
> the content and context of the call, investigators believe that **ADAN** and
> **RUBIO-AYALA** are discussing good quality drugs and drug related

proceeds.

111. Between November 16, 2008, and November 21, 2008, telephone number (785) 438-8757 made 45 contacts on tolls. This phone has been identified though the interception of Target Phone 4 as **Gary HEATH's** new telephone number.

**Telephone Number (785) 506-2015: RUBIO-AYALA**

112. On November 16, 2008, monitors and agents intercepting communications of **MOLINA** utilizing Target Phone 4, determined that **RUBIO-AYALA** had stopped utilizing telephone number (785) 408-2994 and started utilizing telephone number (785) 506-2015.

113. Agents identified telephone number (785) 506-2015 as a Sprint Telephone subscribed to by **Jesus AYALA**, at the residence located at 3100 S.E. Emerson, Topeka, Kansas. Agents have identified (785) 506-2015 as being the same telephone number that **RUBIO-AYALA** utilized previously as being identified by agents as Target Phone 2.

114. On November 16, 2008, agents intercepted an incoming telephone call from (785) 506-2015 to Target Phone 4. During the conversation, monitors identified **RUBIO-AYALA** as the user of (785) 506-2015. During the conversation, **MOLINA**

asked **RUBIO-AYALA** for **Gary** telephone number, believed by agents to be **Gary HEATH**. **RUBIO-AYALA** provided **MOLINA** with the telephone number.

115.   On November 17, 2008, **MOLINA**, utilizing Target Phone 4 received a telephone call from **Gary HEATH**. During the conversation, **HEATH** told **MOLINA** that **HEATH** has being trying to reach their friend and has not been able get in tough with him. **MOLINA** provided **HEATH** with telephone number (785) 506-2015 to contact their friend. Based on the context of the conversation and the information obtained during the course of the investigation, agents believe that **MOLINA** provided telephone number (785) 506-2015 to **HEATH** to contact **RUBIO-AYALA**, the user of (785) 506-2015.

116.   During the interception of Target Phone 4 agent's intercepted conversations between **MOLINA** utilizing Target Phone 4 and FNU LNU utilizing telephone number 520-977-6175, an Arizona-based telephone number, indicating that **MOLINA** was going to travel to Arizona to obtain a shipment of narcotics.

117.   On November 17, 2008, agents intercepted a telephone call from **MOLINA**, utilizing Target Phone 4, to **RUBIO-AYALA** utilizing telephone number (785) 506-2015. During the conversation **RUBIO-AYALA** asked **MOLINA**: "Oh …are you … you're on your way there already or what?" **MOLINA** replied: "Yeah, we're flying there, we have only about seven hours to go."  The context of the

conversation suggests that **MOLINA** and **RUBIO-AYALA** are discussing **MOLINA**'s trip to Arizona.

118. On November 18, 2008, agents intercepted a telephone call from **RUBIO-AYALA** utilizing telephone number (785) 506-2015 to **MOLINA** utilizing Target Phone 4. During the conversation, **RUBIO-AYALA** asked **MOLINA**: "Where are you?" **MOLINA** replied: "Here. What's up?" **RUBIO-AYALA** replied: "Are you already coming in a hurry?" **MOLINA** replied: "Almost." **RUBIO-AYALA** replied: "Hurry up that the people are ready." **MOLINA** replied: "What are they saying?" **RUBIO-AYALA** replied: "Guero (**HEATH**) wants to eat me alive." **MOLINA** replied: "What is the bitch saying?" **RUBIO-AYALA** replied: "I told him well, you are too slow, you asshole. I had them set aside but you took to long. So I had to get rid of them somewhere else." **MOLINA** replied: "And what did he say?" **RUBIO-AYALA** replied: "No bro, don't fuck with me bro. I told him, you keep telling me that tomorrow, then the day after… You are going to get screwed." **MOLINA** replied: "And then what did he say?" **RUBIO-AYALA** replied: "No buddy you have to set them aside for me. Yeah but it was the last one and some fried already took them." The context of the conversation indicates that **RUBIO-AYALA** was inquiring on when **MOLINA** would return to Kansas with the shipment of narcotics because **RUBIO-AYALA** did not have any narcotics to distribute and

customers wanted to obtain narcotics.

119. At approximately 2:42 p.m. on November 18, 2008, **ADAN** received an incoming telephone call from **RUBIO-AYALA**, who was utilizing telephone number (785) 506-2015. **RUBIO-AYALA** asked **ADAN** if he was coming and **ADAN** said, "Almost." **RUBIO-AYALA** then told **ADAN** to hurry up because the "people" are ready. **ADAN** asked what they are saying and **RUBIO-AYALA** said the "Guero wants to eat me alive." **RUBIO-AYALA** told **ADAN** he told "Guero" that, "…You are too slow you asshole. I had them set aside but you took too long so I had to get rid of them somewhere else." **ADAN** later told **RUBIO-AYALA** that the "dude" has to get on it. **RUBIO-AYALA** told **ADAN** that he set aside eight (8) for him. **ADAN** said, "Alright then. We are here taking care of the last detail for the party." Based on training, experience, and the content and context of the call, investigators believe that **ADAN** and **RUBIO-AYALA** are discussing the distribution of drugs to an unknown individual know as "Guero."

120. At approximately 8:32 p.m. on November 19, 2008, **ADAN** received an incoming telephone call from **"PONCHO,"** believed to be **RUBIO-AYALA**, who was utilizing telephone number (785) 506-2015. They briefly discuss **"PONCHO"** getting pulled over for driving fast and ended up in jail briefly. **ADAN** asked **"PONCHO"** what the "buddy" says. **"PONCHO"** said, "They are desperate here."

ADAN said, "The work is more or less now. Now the guy is going to be jumping for

joy." ADAN later told "PONCHO" he would be coming early the following day and

they will count the "paper" to see how much there is. "PONCHO" said he almost

had everything in order. Based on training, experience, and the content and context

of the call, investigators believe that ADAN and "PONCHO" are discussing drugs

that ADAN is transporting and the counting of drug related proceeds.

121.   At approximately 10:44 a.m. on November 20, 2008, ADAN received

an incoming telephone call from RUBIO-AYALA, who was utilizing telephone

number (785) 506-2015. During the call, ADAN told RUBIO-AYALA to get the

"cortinas (drapes/cut)" ready because ADAN wants to fix "it" and then get back.

Based on training, experience, and the content and context of the call, investigators

believe that ADAN is planning to prepare drug with a cutting agent. Later that day,

at approximately 12:49 p.m., ADAN received an incoming telephone call from

RUBIO-AYALA, who was utilizing telephone number (785) 506-2015. During the

call ADAN asked if RUBIO-AYALA had everything ready. RUBIO-AYALA said,

"Everything is set aside there, the 'Cortina (drapes/cut)' is already prepared." ADAN

told RUBIO-AYALA he had a meeting at his child's school and needed to leave

right away. Based on training, experience, and the content and context of the call,

investigators believe that ADAN and RUBIO-AYALA are discussing the preparation

of drugs. Later that day, at approximately 5:53 p.m., **ADAN** received an incoming telephone call from **RUBIO-AYALA**, who was utilizing telephone number (785) 506-2015. During the call **RUBIO-AYALA** told **ADAN**, "I was just seeing the cocksucker here...he has the toys there, the fucking "Cuernos (horse/guns)." **ADAN** told **RUBIO-AYALA**, "Just make sure, because this guy can be full of bullshit." **RUBIO-AYALA** told **ADAN** the guy has the "R" and that he will be getting another one. **ADAN** told **RUBIO-AYALA** to get them all from him. **RUBIO-AYALA** then told **ADAN**, "He has a nice 'Metrallesita (small machine gun)' that is real nice." **ADAN** said, "Get them all from him." **RUBIO-AYALA** said, "He does not want to give the machine gun though." Based on training, experience, and the content and context of the call, investigators believe that **ADAN** and **RUBIO-AYALA** are trying to obtain weapons from an unknown individual.

122. At approximately 4:06 p.m. on November 21, 2008, **ADAN** received an incoming telephone call from **RUBIO-AYALA**, who was utilizing telephone number (785) 506-2015. **RUBIO-AYALA** told **ADAN** he was with "Guero." **ADAN** asked was he saying and **RUBIO-AYALA** said, "I took all the 'Cuernos (horse/guns)'..." **RUBIO-AYALA** also said, "I took...well, the guy only had one "Cuerno (horse/gun)." In the end the guy only had one "Cuerno (horse/gun)" and one, uh...the R-15. And, I took a machine gun from the guy." **ADAN** asked which one he took

and asked if it was nice. **RUBIO-AYALA** said, "…the fucking "Cuerno (horse/gun)"

is real nice…" **ADAN** asked, "He had two or just one?" **RUBIO-AYALA** said, "He

had one and just the R…The machine gun is real nice, man. It's one of those small

ones." **ADAN** asked if **RUBIO-AYALA** wanted to try them out on Monday and

**RUBIO-AYALA** said, "Sure." Based on training, experience, and the content and

context of the call, investigators believe that **ADAN** and **RUBIO-AYALA** are

discussing the purchase of weapons. Later that day, at approximately 5:07 p.m.,

**ADAN** received an incoming telephone call from **RUBIO-AYALA**, who was

utilizing telephone number (785) 506-2015. During the call, **RUBIO-AYALA** asked

**ADAN** how much he should put in. **ADAN** asked, "Which ones?" and

**RUBIO-AYALA** said, "The (U/I) four (4) eight (8)." **ADAN** asked, "Are you going

to fix them or what?" **RUBIO-AYALA** said, "Yeah man, because the son of a bitch

is pestering and pestering." **RUBIO-AYALA** later said that a buddy took four (4)

and that he left another guy four (4) short. **ADAN** asked, "…So you left him just how

many? Twelve?" **RUBIO-AYALA** said, "Yeah." **ADAN** said, "Put four in it, give

him another twelve (12)." Based on training, experience, and the content and context

of the call, investigators believe that **ADAN** and **RUBIO-AYALA** are discussing the

preparation of drugs. Later that day, at approximately 6:38 p.m., **ADAN** received an

incoming telephone call from **RUBIO-AYALA**, who was utilizing telephone number

(785) 506-2015. **RUBIO-AYALA** told **ADAN** they were struggling with the buddy and "Guero." **ADAN** said, "Oh, they want work?" **RUBIO-AYALA** said, "Yeah." **ADAN** asked what did the buddy say and **RUBIO-AYALA** said the buddy took another on right away. **RUBIO-AYALA** later asked **ADAN**, "…How many did you bring for me to keep count of. How many I am taking out?" **ADAN** said, "Eleven (11)." Based on training, experience, and the content and context of the call, investigators believe that **ADAN** and **RUBIO-AYALA** are discussing the distribution of drugs.

123.   At approximately 2:14 p.m. on November 23, 2008, **ADAN** received an incoming telephone call from **RUBIO-AYALA**, who was utilizing telephone number (785) 506-2015. **RUBIO-AYALA** told **ADAN** he was going to take some of the "girls" from over there for a ride. **ADAN** asked, "So that would make what, five (5)?" **RUBIO-AYALA** said, "Yeah." **ADAN** said, "Alright. The shit's going strong isn't it?" They discuss "Guero" and **RUBIO-AYALA** said he paid for the ones **RUBIO-AYALA** gave him the other day. **ADAN** asked, "The twelve (12)?" **RUBIO-AYALA** said, "Yes, he paid me just now." They later discuss the "buddy" and **ADAN** asked if two (2) have been given to him. **RUBIO-AYALA** said, "It's already two (2), yes." Based on training, experience, and the content and context of the call, investigators believe that **ADAN** and **RUBIO-AYALA** are discussing

amounts of drugs sold to others.  Later that day, at approximately 9:36 p.m., **ADAN** placed an outgoing telephone call to **RUBIO-AYALA**, who was utilizing telephone number (785) 506-2015.  **ADAN** asked if the work is going out good and **RUBIO-AYALA** said the work is good.  **ADAN** said, "…We can do another more or less ones, it'll yield more, but we'll struggle more too." **RUBIO-AYALA** said the buddy was happy but he asked him why does not pay more.  They discuss **ADAN** giving someone another twelve (12).  **RUBIO-AYALA** said, "No, but I am talking about the other "Jale (work)," that of the green cars…the green car…" **ADAN** said, "Okay, okay, okay."  **ADAN** and **RUBIO-AYALA** also discussed sending "papers" to Mexico and that **ADAN** wanted to send ten (10).  Based on training, experience, and the content and context of the call, investigators believe that **ADAN** and **RUBIO-AYALA** are discussing good quality drugs and drug related proceeds.

**Surveillance of MOLINA to Arizona**

124.   During interception of communication to and from Target Phone 4 agents learned that **MOLINA** left Great Bend, Kansas, on November 17, 2008, to travel to Phoenix, Arizona, to obtain a shipment of narcotics. Agents utilized physical and electronic surveillance to track **MOLINA's** movements as **MOLINA** traveled to and from Phoenix, Arizona. On November 19, 2008, agents followed **MOLINA**

across south western Kansas during his return trip from Phoenix, Arizona, to Great

Bend, Kansas. Agents followed **MOLINA** to his residence located at 2111 Monroe,

Great Bend, Kansas. During the morning and afternoon hours of November 20, 2008,

**MOLINA** traveled from Great Bend, Kansas, to Topeka, Kansas, where **MOLINA**

met with **RUBIO-AYALA** at 3100 S.E. Emerson, Topeka, Kansas, a suspect stash

house location for narcotics.

125.  On November 20, 2008, agents intercepted a telephone call from

**RUBIO-AYALA**, utilizing (785) 506-2015, to **MOLINA** utilizing Target Phone 4.

During the conversation **MOLINA** stated: "To get the cortinas (CUT) and everything

ready because he wants to fix it and get back." **RUBIO-AYALA** agreed. The context

of the conversation and surveillance conducted by agents indicates that **MOLINA**

was delivering a shipment of narcotics to **RUBIO-AYALA** and that **MOLINA**

wanted **RUBIO-AYALA** to have the cutting agent ready so that the shipment of

narcotics could be prepared for distribution.

126.  On November 21, 2008, agents intercepted a telephone call from

**MOLINA** utilizing Target Phone 4 to **RUBIO-AYALA** utilizing (785) 506-2015.

During the conversation, **RUBIO-AYALA** told **MOLINA**: "I took all the 'cuernos'

(guns), I took all the toys away from him." **MOLINA** replied: "All of them."

**RUBIO-AYALA** replied: "I took… well, the guy only had one "cuerno" (gun). In the

end the guy only had one "cuerno" (gun) and one, uh… the R-15. And I took a machine gun from the guy." **MOLINA** replied: "Fucking guy, I tell you the guy is full of bull shit. But which one did you take? Is it real nice or what?" **RUBIO-AYALA** replied: No, the fucking "cuerno" (gun) is real nice, buddy. The thing is pretty." **MOLINA** replied: He had two or just one? **RUBIO-AYALA** replied: " he had one and just the R. A machine gun. The machine gun is real nice man. It's one of those small ones. The thing is real nice." The context of the conversation indicates that **RUBIO-AYALA** obtained firearms from an unknown person.

127.    On November 21, 2008, agents intercepted a telephone call from **RUBIO-AYALA**, utilizing (785) 506-2015, to **MOLINA** utilizing Target Phone 4. During the conversation **MOLINA** asked: "Oh they want work?" **RUBIO-AYALA** replied: "yeah." **MOLINA** replied: "What does the buddy say?" **RUBIO-AYALA** replied: No, well, the buddy took another one right away." **MOLINA** replied: "HUH? " **RUBIO-AYALA** replied: "The buddy wanted another one right away. And now, well, in the end another one. In the end I said , what for? Better I take one out and then I settle them all shit." **MOLINA** replied: "uh-huh." **RUBIO-AYALA** replied: "alright how many did you bring? For me to keep count of how many I am taking out." **MOLINA** replied: "Eleven." The context of the conversation indicates that **RUBIO-AYALA** has been distributing the narcotics that **MOLINA** delivered to

Topeka, Kansas, from Arizona on November 20, 2008. When discussing "one" and "eleven" agents believe that **MOLINA** and **RUBIO-AYALA** are referring to pound amounts of narcotics.

128. On November 22, 2008, agents intercepted a telephone call from **MOLINA**, utilizing Target Phone 4, to **RUBIO-AYALA**, utilizing (785) 506-2015. During the conversation, **RUBIO-AYALA** stated: "That shit is real good." **MOLINA** replied: "It is, Isn't it?"   The context of the conversation indicates that **RUBIO-AYALA** and **MOLINA** were discussing the quality of the narcotics that **MOLINA** had previously delivered to **RUBIO-AYALA**.


**Phone Toll Analysis for (785) 506-2015**

129.   Toll analysis for  (785) 506-2015 was conducted from November 15, 2008, through November 21, 2008, the time period that agents have identified while **RUBIO-AYALA** is the primary user of (785) 506-2015.  Agents cannot say with any certainty that **RUBIO-AYALA** was the primary user of  (785) 506-2015 prior to November 15, 2008.

130.  Between November 15, 2008, through November 21, 2008, (785) 506-2015 placed/received approximately 507 telephone calls.  (785) 506-2015 placed/received approximately 41 telephone calls to/from telephone number (620)

282-3514 (Target Phone 4), which is subscribed to Maria VASQUEZ, and utilized by **Adan MOLINA**. As shown herein, **MOLINA** and **RUBIO-AYALA** are close co-conspirators in the trafficking of controlled substances and numerous of these telephone calls are mentioned herein. It is noted that on November 26, 2008, at 11:21 p.m., **MOLINA** spoke with **HEATH** on telephone number (620) 282-3514 (Target Phone 4), and **MOLINA** stated "I'll call you tomorrow from a new number." There has been no further meaningful contact to or from (620) 282-3514 (Target Phone 4) and agents stop monitoring it on December 2, 2008. (785) 506-2015, further had contact on 19 occasions with Mexico based telephone numbers.

131. Additional toll analysis indicates (785) 506-2015 has had approximately 41 contacts with Missouri-based telephone numbers, 14 telephone contacts with Denver, Colorado-based telephone number (**NUNEZ**, a co-conspirator, has stated that he has a SOS in Denver, and **MOLINA** has had conversations with a drug courier who is presently using a Colorado-based telephone number, the last known contact between **MOLINA** and said drug courier being on November 20, 2008), 7 contacts with a Nevada-based number (the last known contact was November 18, 2008), and 1 contact with each a Georgia (the last known contact was November 16, 2008), California (the last known contact was November 16, 2008), and Texas-based telephone number (the last known contact was November 20, 2008). The remaining

telephone contacts (785) 506-2015 had were with Kansas-based telephone numbers.

**Telephone Number (913) 596-0014 Target Phone 6**

132.   On December 3, 2008, at approximately 10:43 a.m., TFO Garman acting in an undercover capacity, called **NUNEZ** to arrange to purchase methamphetamine. **NUNEZ** stated that he was at the hospital with family and wanted TFO Garman to call **NUNEZ's** partner to obtain the methamphetamine from. **NUNEZ** identified the person that **NUNEZ** wanted TFO Garman to call as "**PONCHO**." **NUNEZ** told TFO Garman that **NUNEZ** would get **PONCHO's** telephone number and call TFO Garman back.  At approximately 10:47 a.m., TFO Garman received a telephone call from **NUNEZ** that TFO Garman did not answer. At approximately 10:51 a.m., TFO Garman returned **NUNEZ's** telephone call. **NUNEZ** asked TFO Garman if he had a pen, and provided TFO Garman with telephone number (913) 596-0014. **NUNEZ** asked TFO Garman "How much you need?" TFO Garman stated that he just wanted to see if **NUNEZ** could get some stuff, because it had been a while and TFO Garman needed some. TFO Garman asked if the telephone number was for "**PONCHO**," and **NUNEZ** replied that it was. TFO Garman confirmed that "**PONCHO**" was **NUNEZ's** "partner," that **NUNEZ** had referred to during methamphetamine transactions with TFO Garman and **NUNEZ** confirmed that it was. **NUNEZ** instructed TFO Garman

to tell "**PONCHO**" that he had gotten "**PONCHO's**" number from **NUNEZ**, and that **NUNEZ** told TFO Garman to call "**PONCHO**." TFO Garman said that he would tell "**PONCHO**" that **NUNEZ** had told TFO Garman to call "**PONCHO**" to get some work, and **NUNEZ** replied yeah. TFO Garman asked **NUNEZ** if the price was going to be the same. **NUNEZ** asked TFO Garman if TFO Garman needed one (1) and one half (½) right now. TFO Garman replied yes, if not more. TFO Garman agreed to call "**PONCHO**." The content and context of the conversation indicates that **NUNEZ** wanted TFO Garman to call "**PONCHO**," **NUNEZ's** methamphetamine distributing partner, to obtain methamphetamine and provided TFO Garman with "**PONCHO's**" telephone number.

133.    On December 3, 2008, at approximately 10:57 a.m., TFO Garman, acting in an undercover capacity, contacted "**PONCHO**," by calling telephone number **(913) 596-0014 (Target Phone 6)**. TFO Garman made contact with "**PONCHO**" on the phone, and confirmed it was "**PONCHO**" by asking "is this '**PONCHO**'?" "**PONCHO**" replied: "Yeah, who is this?" TFO Garman explained that it was "Doug," a friend of **NUNEZ's**, and that **NUNEZ** gave TFO Garman the number and told TFO Garman to call. TFO Garman and "**PONCHO**" had casual conversation about **NUNEZ** and **NUNEZ's** telephone being lost and not working for a couple of days. TFO Garman told "**PONCHO**" that **NUNEZ** had told TFO Garman that

"**PONCHO**" and TFO Garman "could get together or something." "**PONCHO**"

replied: "Yeah but I'm in KC (Kansas City) right now. I can call you when I get

back." TFO Garman stated okay, "I need to get a couple from you." (referring to a

couple ounces of methamphetamine) "**PONCHO**" replied: "How many people?" TFO

Garman replied "Two (2), I need to get two (2) from you." TFO Garman asked

"**PONCHO**" how much? "**PONCHO**" replied: "How much **Francisco (NUNEZ)** tell

you?" TFO Garman stated that **NUNEZ** told TFO Garman to get with "**PONCHO**."

TFO Garman explained that **NUNEZ** stated that "**PONCHO**" was his partner and that

**NUNEZ** said that "**PONCHO**" would take care of TFO Garman. "**PONCHO**"

replied: "Okay, I will call you when I come back." TFO Garman confirmed that

"**PONCHO**" had TFO Garman's telephone number on caller ID and "**PONCHO**"

stated that he did. The content and context of the conversation indicates that

"**PONCHO**" knew **NUNEZ** and agreed to distribute two (2) ounces of

methamphetamine to TFO Garman when "**PONCHO**" returned to Topeka, Kansas

from the Kansas City Metro area.

134.   On December 3, 2008, DEA SA John Shannon e-mailed a copy of the

recorded conversation between TFO Garman and "**PONCHO**" to the wiretap

monitors in St. Louis, Missouri, who have been monitoring authorized interception

of Target Phones 1, 2, 3, 4, and 5 during the course of this investigation. The monitor

identified the person that TFO Garman talked to by calling telephone number **(913)**

**596-0014 (Target Phone 6)** as **Alfonso RUBIO-AYALA, a.k.a. "PONCHO."**

135.   On December 3, 2008, at approximately 4:44 p.m., TFO Doug Garman,

acting in an undercover capacity, received a telephone call from **RUBIO-AYALA,**

**a.k.a. "PONCHO,"** who was utilizing telephone number **(913) 596-0014 Target**

**Phone 6**. During the conversation, **RUBIO-AYALA** identified himself to TFO

Garman as "**PONCHO**," and asked where TFO Garman was at. TFO Garman stated

that he was out-of-town working, and asked to get with "**PONCHO**" the following

day.   "**PONCHO**" agreed. As the conversation continued, TFO Garman asked

"**PONCHO**": "What can I get one (1) for?"   "**PONCHO**" replied: "How much does

**Francisco (NUNEZ)** charge you?" TFO Garman requested that "**PONCHO**" give

TFO Garman a break on the price, and told "**PONCHO**" that **NUNEZ** had been

charging TFO Garman $1400.00.   "**PONCHO**" explained to TFO Garman that

"**PONCHO**" was going to have to give something to **NUNEZ** for sending TFO

Garman to "**PONCHO**," and TFO Garman indicated that he understood. TFO

Garman told "**PONCHO**" that TFO Garman wanted to get one (1) tomorrow for sure,

and would like to get two (2), but had to collect some money during the evening.

"**PONCHO**" and TFO Garman agreed to meet the following day to conduct a

narcotics transaction. The content and context of the conversation indicates that

**RUBIO-AYALA** agreed to distribute one (1) to two (2) ounce of methamphetamine to TFO Garman. However, "**PONCHO**" was concerned about the amount per ounce of methamphetamine that TFO Garman had paid **NUNEZ** during prior transactions.

**Phone Toll Analysis for (913) 596-0014 (Target Phone 6)**

136. On December 3, 2008, after identifying **RUBIO-AYALA's** new telephone number, **(913) 596-0014 (Target Phone 6)**, agents requested subscriber and phone tolls for **Target Phone 6**. Agents received the data during the late-afternoon hours of December 3, 2008, and identified **Target Phone 6** as a **pre-paid T-Mobile cellular telephone with IMSI # 310260904571197, which is subscribed to Omar HERNANDEZ at 2004 N. 51, # 6, Kansas City, Kansas**. As shown herein, **RUBIO-AYALA** has been identified as the primary user of **Target Phone 6**. Phone toll analysis of Target Phone 6 identified that **RUBIO-AYALA**, using **Target Phone 6**, had made/received a total of 241 telephone calls between November 25, 2008, and December 1, 2008 (the last date of toll information). These 241 telephone calls were with a total of 36 different telephone numbers, 35 of the telephone numbers being in the United States and one (1) telephone number being a Mexico-based telephone. Of the 35 different telephone numbers contacted in the United States, agents identified four (4) telephone numbers from the phone tolls analysis of Target Phone 6 that

agents have been able to identify as previously being intercepted during authorized interception as described above in the affidavit. Those telephone numbers are: (785) 969-6163, subscribed to by Banuelos R. FIGUEROA at 3711 S.E. 30th Terrace, Topeka, Kansas, with 30 contacts between November 25, 2008, and December 1, 2008 (last date of contact); (785) 207-6990 identified as a Tracfone with no subscriber information with 13 contacts between November 26, 2008, and December 1, 2008 (last date of contact); (785) 438-8757 a pre-paid telephone identified during the authorized interception of Target Phone 4 as being utilized by **Gary HEATH** with  four (4) contacts between November 27, 2008, and November 28, 2008 (last date of contact); (785) 640-1617 (Target Phone 5), subscribed to by **Francisco NUNEZ** at 2025 S.E. Ohio, Topeka, Kansas, with one (1) contact on November 27, 2008 (last date of contact).   During the interception of Target Phone 2, agents intercepted conversations between **RUBIO-AYALA** and the user of telephone number (785) 969-6163, subscribed to by Banuelos FIGUEROA.   These conversations were pertinent to the distribution of controlled substances.  However, agents have not been bale to positively identify the actual user of telephone number (785) 969-6163.  On November 6, 2008, agents observed a red, 2000 Chevy Truck that displayed Kansas tag WHG 463 parked at the residence located at 3100 S.E. Emerson, Topeka, Kansas. The residence located at 3100 S.E. Emerson, Topeka,

Kansas, is a suspected drug stash house utilized by **RUBIO-AYALA** and MOLINA.

A check of the Kansas registration for the tag WHG 463 identified the vehicle as a

2000 Chevy truck registered to FIGUEROA.  Agents thus believe that it is likely to

be FIGUEROA, but have not been able to identify the actual user of the telephone at

this time during the authorized interception or surveillance.

137.  Additionally, agents identified seven (7) phone contact between Target

Phone 6 and two (2) different Missouri-based telephone numbers on November 29,

2008 (last date of contact); three (3) contacts with two (2) different Georgia-based

telephone numbers between November 28, 2008, and November 30, 2008 (last date

of contact); three (3) contacts with two (2) different California-based telephone

numbers between November 27, 2008, and December 1, 2008 (last date of contact);

one (1) telephone contact with a Colorado-based telephone on November 29, 2008

(last date of contact); one (1) telephone contact with a New Jersey-based telephone

number on November 26, 2008 (last date of contact); and three (3) contacts with a

Mexico-based telephone number on November 27, 2008 (last date of contact). The

remaining telephone contacts are with Kansas-based telephones between November

25, 2008, and December 1, 2008 (last date of contact).

**Prior Applications**

138.   A check of electronic surveillance files maintained by the ATF, DEA, FBI and ICE was completed on December 4, 2008.  I have not been informed by any agency that there were prior applications for Court authorization to intercept wire, oral or electronic communications of the INTERCEPTEES, except as described below:

139.   DEA RESULTS:   Francisco Mendez-Nunez, a.k.a. "Pancholine Mendez-Nunez," "Pancho Mendez-Nunez," (NFI) was named in an order for Title III wire intercept of communications signed by United States District Judge James F. Holderman, Northern District of Illinois, on August 14, 2007.   Francisco Mendez-Nunez, a.k.a. "Pancholine Mendez-Nunez," "Pancho Mendez-Nunez," (NFI) was named in an order for Title III wire intercept communications signed by United States District Judge James F. Holderman, Northern District of Illinois, on October 9, 2007.

140.   FBI:  RESULTS:  NO RESULTS FOUND.

141.   ICE RESULTS: One Francisco Nunez, date of birth unknown, was named in an Order, Order number EP-03-CR-2144-KC signed, May 25, 2004, by U.S. District Court Judge Kathleen Cardone, Western District of Texas, authorizing an electronic interception of cell phone (213) 259-4918, IMSI: 316010101009275, for

a period of 30 days.

142.   A prior application for the interceptees (target violators ie., **Gary HEATH, Danielle KOSTIUK, Ron FUNK, Michael ULLMAN, ANTONIO LNU, Brad LILES and Lance GUZMAN**) was made on August 11, 2008.  This order for the interception of Target Telephone 1 was signed by the Honorable Richard D. Rogers, Senior United States District Judge, District of Kansas.  Target Telephone 1 was discarded by **HEATH** on or about August 19, 2008.

143.   On September 15, 2008, the Honorable Richard D. Rogers, Senior United States District Judge, District of Kansas, signed an order authorizing the wire communications interception of Target Telephone 3, which was monitored from September 15, 2008, to October 10, 2008.   Agents ceased monitoring Target Telephone 3 on October 10, 2008, because it had apparently been discarded by **HEATH**.

144.   Additionally, on September 30, 2008, the Honorable Richard D. Rogers, Senior United States District Judge, District of Kansas, signed an order authorizing the wire communications interception of (785) 506-2015 (Target Phone 2), utilized by **Alfonso RUBIO-AYALA**.  Target Telephone 2 was monitored from September 30, 2008, to October 10, 2008, at which time it was apparently discarded by **RUBIO-AYALA**.

145.   On October 29, 2008, the Honorable Richard D. Rogers, Senior United States District Judge, District of Kansas, signed an order authorizing the wire communications interception of Target Telephone 4, utilized by **Adan MOLINA**. Monitoring of Target Telephone 4 ended on December 2, 2008, after Judge Rogers signed a 30-day extension on November 24, 2008.

146.   On November 10, 2008, the Honorable Richard D. Rogers, Senior United States District Judge, District of Kansas, signed an order authorizing the wire communications interception of Target Telephone 5, utilized by Francisco **NUNEZ**. Monitoring of Target Telephone 5 ceased on December 3, 2008.

147.   Therefore, Target Telephone 6 is the seventh (7) application on the subject violator and others during this investigation.   Prior applications to the court include:   Target Telephone 1, Target Telephone 2, Target Telephone 3, Target Telephone 4 and the extension thereof, and Target Telephone 5.   No other federal applications are known to have been made to intercept the wire, oral, or electronic communications of any of the named subjects or involving the target telephone.

## NEED FOR AUTHORIZED INTERCEPTION OF (913) 596-0014
## (TARGET PHONE 6)

148.   Since June 2008, members of the KBI, ATF, DEA, Topeka, Kansas,
Police Department, Shawnee County, Kansas, Sheriff's Department and the
I-135/I-70 Drug Enforcement Task Force have been conducting an investigation into
this drug trafficking organization.   Agents have identified telephone number **(913)
596-0014 (Target Telephone 6)** as a telephone being utilized by **Alfonso
RUBIO-AYALA**.   Based on the context of the telephone calls between **NUNEZ**,
utilizing Target Telephone 5, and **RUBIO-AYALA**, utilizing Target Telephone 2 and
(785) 408-2994, it appears that **NUNEZ** is a methamphetamine transporter/partner
for **RUBIO-AYALA**.   On December 3, 2008, agents learned RUBIO-AYALA's new
telephone number is   **(913) 596-0014 (Target Telephone 6)**. The investigation has
exposed an extensive network of drug traffickers in Topeka, Kansas, and other
locations.   However, agents have not positively identified all of the locations used by
the organization for the storage of drugs, nor the modes of transferring monies
derived from the sale of the drugs, nor the Source of Supply (SOS).   In order to
successfully identify and subsequently dismantle the entire organization, it is essential
to intercept the wire communications of the organization's members.   It is imperative
to intercept the wire communications of **RUBIO-AYALA**, who is currently utilizing

telephone number **(913) 596-0014 (Target Phone 6)**.  Since the investigation shows that **RUBIO-AYALA** is an importer and distributor of methamphetamine for the Topeka, Kansas, area and has direct access to the sources of supply for the methamphetamine in Mexico.  Based upon my training and experience, I expect that the interception of wire communications over **(913) 596-0014 (Target Phone 6)** will enable agents to identify those individuals who actually import methamphetamine from Mexico to the Topeka, Kansas, based distribution network area.  I expect that interception of the wire communications over **(913) 596-0014 (Target Telephone 6)** will enable agents to identify stash locations of methamphetamine, methods utilized by theses co-conspirators to conceal and transport drug proceeds and further identify additional co-conspirators involved in this conspiracy not yet known to agents.

149.   There are presently no wire communications being monitored between **MOLINA** and **RUBIO-AYALA**.  As stated above, on December 2, 2008, monitoring of (620) 282-2074 (Target Telephone 4) ceased, on December 3, 2008, monitoring of (785) 640-1617 (Target Telephone 5) ceased.  It is readily apparent that **MOLINA** is no longer using (620) 282-2074 (Target Telephone 4).   It appears that this "dropping" of (620) 282-2074 (Target Telephone 4) is in response to a telephone conversation between **MOLINA** and **HEATH** on November 26, 2008, at approximately 11:21 p.m., when **ADAN** received an incoming telephone call from

**Gary HEATH**, telephone number (785) 438-8757.  During the conversation, **ADAN** told **HEATH** they were scared because they thought **HEATH** was having some problems.   **ADAN** later asked if **HEATH** had problems with the "blue guys." **HEATH** asked, "The Police?" **ADAN** said, "Yeah." **HEATH** told **ADAN** it was an automobile issue and they would discuss later.  Note: **Gary HEATH** was arrested by members of the Topeka Police Department on November 24, 2008, for possession of methamphetamine and drug paraphernalia.  This is entirely consistent with the subsequent conversation stated in paragraph 119 herein, where **MOLINA** indicates that he will subsequently be calling from a new telephone number.  Not being privy to those subsequent conversations, agents have no avenue for further information. Based on training, experience, and the content and context of the call, investigators believe that **ADAN** and **HEATH** are discussing **HEATH's** arrest on November 24, 2008.  Further, based on training, experience, and the content and context of the call, investigators believe that **ADAN** believed **HEATH** was now under law enforcement scrutiny, so **ADAN** quit using (620) 282-2074 (Target Telephone 4).  Agents know that this is a common response among drug dealers.

**Unavailability of Alternative**

150.   Numerous investigative techniques that are usually employed in the investigation of this type of criminal case have been tried and have failed, reasonably appear to be unlikely to succeed if they are tried, or are too dangerous to employ. At present, agents have no way of knowing what this criminal organization is doing. These techniques are described below:

**Physical Surveillance**

151.   During the course of this investigation, investigators have attempted to conduct physical surveillance on various members of this drug trafficking organization. Investigators have been able to establish locations where members of the organization frequent and/or reside and have also proven the relationship between members of the conspiracy by physically placing many of the targets in one another's company. While this has helped in corroborating independent information provided by undercover agents and confidential sources, it has not uncovered the entire organizational structure, nor has it provided sufficient evidence to prosecute all members of this organization. Physical surveillance is not likely to establish the roles of all of the named conspirators, to identify additional conspirators or otherwise to provide admissible evidence in regard to this investigation, because by the very

nature of the drug distribution conduct alleged herein, it is the content of the telephone communications which facilitate the crime. Physical surveillance alone will not identify the person or people from whom **RUBIO-AYALA** and his associates are receiving drugs from, or to whom **RUBIO-AYALA** and his associates are delivering drugs to or obtaining money from, the true identity of those individuals who are assisting this organization and/or the manner in which members of this organization run their drug operation from day-to-day. I anticipate that the wire interceptions will provide information about the location and timing of future methamphetamine and currency shipments that may result in significant seizures of narcotics and narcotics proceeds. Physical surveillance alone will not achieve these objectives and risks alerting targets of this investigation to the existence of this investigation. **RUBIO-AYALA**, as shown herein, has access to multiple vehicles and travels to Great Bend, Kansas, and to the Kansas City area. The travel time to Great Bend is approximately three hours from Topeka. **RUBIO-AYALA** spent the bulk of his time in Great Bend with **MOLINA** during the last trip, which was surveilled. Surveillance proved essentially fruitless, other than showing the two men together. Obviously, when the two men are together, their phones are essentially silent. **RUBIO-AYALA's** residence sits at the end of a T-intersection, which makes surveillance problematic without detection.

152.   On November 24, 2008, agents conducted surveillance of the residence located at 3100 S.E. Emerson, Topeka, Kansas. While conducting surveillance at the residence located at 3100 S.E. Emerson, Topeka, Kansas, citizens from that neighborhood contacted local law enforcement and reported a suspicious vehicle in their neighborhood. Local law enforcement responded to these complaints, made contact with the vehicle and its occupants, and found an agent on the surveillance team who had been reported to the police for setting in the neighborhood. Agents observed whom agents believe to be **MOLINA** and **RUBIO-AYALA** travel to **RUBIO-AYALA's** residence located at 4430 S.E. Minnesota, Topeka, Kansas. From there, agents followed a Mercury Sable with Kansas tag 114 AKL registered to **MOLINA**, and truck, to the residence located at 513 S.E. Leland.  Agents believe the occupants of the vehicles to be **MOLINA** and **RUBIO-AYALA**.  At the residence located at 513 S.E. Leland, agents observed the vehicles pull through the alley to the back of the residence. After several minutes, agents observed two (2) trucks leave the area behind the residence located at 513 S.E. Leland.  Agents conducted surveillance of these trucks, and identified one of the trucks as displaying Kansas tag 114 AKL that registered to **MOLINA's** Mercury Sable.  Agents followed both of these vehicle to the Kansas City Metro area, where the vehicles went to a residential location just north of the intersection at 16th and Douglas, in Kansas City, Kansas. Agents

established surveillance in the area. While conducting surveillance of the residence in Kansas City, Kansas, a citizen from the community within that neighborhood contacted local law enforcement to reporting a suspicious vehicle. Local law enforcement responded and conducted a traffic stop of the vehicle in question, only to find one of the agents on the surveillance team. After law enforcement left the area, a citizen started following one of the agents conducting surveillance through the neighborhood. Agents discovered that one of  the vehicles had left the residence being surveilled undetected, and terminated the surveillance at that time.

**Trash Searches**

153.   In traditional narcotics investigations, it is a common and effective investigative technique to search trash from a residence to assist in establishing probable cause to obtain a search warrant. Agents currently have enough information to establish probable cause to search the residence of **RUBIO-AYALA** and some of **RUBIO-AYALA**'s co-conspirators. A search of **RUBIO-AYALA**'s residence would more than likely not lead to the discovery of evidence sufficient to convict **RUBIO-AYALA** of anything further then the distribution of methamphetamine, nor would it identify sources of supply for the methamphetamine, other stash locations of methamphetamine and illegal proceeds, nor would it identify the other unknown

co-conspirators involved in the investigation. Additionally, the execution of search warrants at this stage in the investigation would only identify the investigation to co-conspirators and more then likely lead to the co-conspirators changing their methods of operation.

154.   On November 21, 2008, Kansas Bureau of Investigation (KBI) Special Agent (SA) Amanda Young and SA Doug Jorgensen, assisted by members of the Shawnee County, Kansas, Sheriff's Department, attempted to conduct a trash search at **RUBIO-AYALA's** residence located at 4430 S.E. Minnesota, Topeka, Kansas. At the time agents attempted to collect the trash, the trash had not been placed in an area for collection and agents were unable to collect the trash.

155.   On November 21, 2008, Kansas Bureau of Investigation (KBI) Special Agent (SA) Amanda Young and SA Doug Jorgensen, assisted by members of the Shawnee County, Kansas, Sheriff's Department, conducted a trash search at the residence located at 3100 S.E. Emerson, Topeka, Kansas. During the course of this investigation agents have identified the residence located at 3100 S.E. Emerson, Topeka, Kansas, through surveillance and authorized interception of communications, as being a suspected stash house location for **RUBIO-AYALA** and **MOLINA**. Agents discovered trash set in a location ready for collection by the servicing trash service company. Agents collected the trash from the residence located at 3100 S.E.

Emerson, Topeka, Kansas.   During a search of the trash, agents discovered the following items: (a) several empty cardboard spools of electrical tape. Agents believe that **RUBIO-AYALA** and co-conspirators are utilizing the electrical tape to assist in packaging proceeds from narcotics trafficking when preparing the proceeds for transport, as is a common practice for drug traffickers; (b) several sandwich-size plastic baggies with the corners missing and several plastic baggie corners. Agents believe that **RUBIO-AYALA** and co-conspirators are utilizing the plastic baggies to package controlled substance for distribution, as is a common practice for drug traffickers. The plastic baggies collected by agents were wet with moisture and were unable to be tested for controlled substances at the time of collection; © agents discovered aluminum foil, some with black electrical tape affixed to the aluminum foil.  There was no food residue present with the aluminum foil, and agents believe that **RUBIO-AYALA** and co-conspirators were utilizing the electrical tape and aluminum foil during the packaging process associated with the distribution of controlled substances, as is a common practice for drug traffickers; and (d) agents discovered several pieces of documents including *Western Union Money Wire Transfer Receipts*. All of the documents had been torn up in to smaller pieces, were wet with moisture and agents at this time have not been able identified any useful information from the documents.

156.   The above-listed trash search provided useful information in identifying the residence located at 3100 S.E. Emerson, Topeka, Kansas, as a stash house location utilized by **RUBIO-AYALA** and **MOLINA**. However, the evidence collected during the trash search and/or the evidence suspected of being collected (controlled substances and drug proceeds) during a search warrant at the residence located at 3100 S.E. Emerson, Topeka, Kansas, would not be sufficient to identify **RUBIO-AYALA** and **MOLINA's** Source of Supply (SOS) for the controlled substances and any subordinate dealers whom distribute these controlled substances. Furthermore, the evidence collected would not be sufficient in successfully prosecuting the SOS and unidentified co-conspirators involved in the distribution of these controlled substances. Additionally, conducting enforcement actions such as search warrants would only identify the present investigation to the criminal organization responsible for the transportation and distribution of these controlled substance, allowing the unidentified co-conspirators to avoid criminal prosecution, and resume the distribution of controlled substances at another time in a different manner.

**Undercover Police Officers and Agents**

157.   Based on my training and experience, I know that most high-level narcotics traffickers and money laundering organizations are extremely exclusive in determining with whom they will conduct, or even discuss, illegal narcotic activities. Due to the close and secretive nature of the organizations, it is both highly unlikely and very dangerous for an undercover agent to attempt to infiltrate the upper echelons of such an organization. An undercover agent has been able to infiltrate this organization up to the level of **NUNEZ**, however, **NUNEZ** told the undercover agent that the undercover agent would not be able to deal directly with **NUNEZ**'s SOS. I believe that upper level members of this organization will not associate with individuals other than their longtime associates, or family members, in a manner in which they would allow those individuals to be privy to the complete scope of their criminal activities. I know, based on my training and experience that it is very difficult for an undercover agent to associate with a high level drug distributor such as **RUBIO-AYALA**'s SOS, who may not even be in the United States. Drug distributors in a community are commonly known by other persons involved in the distribution of drugs and have an established reputation as a drug dealer. An undercover agent would not have established such a reputation and it would take an undercover agent several months, if not years, to establish a reputation and trust.

**G.P.S. Tracking Surveillance**

158.   Consideration has been given to the installation of G.P.S. tracking systems on vehicles that **RUBIO-AYALA** operates. A G.P.S. tracking system requires a power source to record and send information for investigators to review. G.P.S. systems can be installed on vehicles using a battery pack as a source of power, however the preferred installation method is to use the vehicle's power source to power the G.P.S. unit.  Using a battery powdered G.P.S. system will greatly diminish the amount of time that the G.P.S. system will operate, and require continued servicing of the G.P.S. system to change batteries. The use of a battery powered G.P.S. system greatly limits the amount of "live tracking" that investigators can utilize the G.P.S. system for.  The "live track" operation of the G.P.S. system requires much more power and drains the batteries quickly.  A G.P.S. system, although extremely useful at times, doesn't allow for investigators to identify co-conspirators and their level of involvement in the organization. For purposes of this investigation, investigators would have to consider the installation G.P.S. tracking systems on more then one vehicle to monitor all of **RUBIO-AYALA**'s actions because **RUBIO-AYALA** operates several different vehicles some of which are not known to agents. Investigators do not have a legal reason to seize any of **RUBIO-AYALA**'s vehicles to install a G.P.S. system to operate off the power system of the vehicle,

without revealing the on-going investigation to **RUBIO-AYALA**. Investigators are left with the option of installing battery powered G.P.S. systems on the known vehicles that these targets operate. The installation of the battery powered G.P.S. systems would require investigators to covertly install the G.P.S. systems late at night or during the early morning hours, while the vehicles are parked. The installation of the G.P.S. systems on **RUBIO-AYALA**'s vehicles poses a risk that investigators may be detected by **RUBIO-AYALA** and/or other persons in the area. If the covert installation was successful, investigators would have to service the G.P.S. systems on a regular basis to obtain the information recorded and install new batteries to provide an ample power source for the G.P.S. systems, thus increasing the risk that investigators may be detected by **RUBIO-AYALA** or other persons in the area. Even if successful installation and service of the G.P.S. systems could be conducted without detection from **RUBIO-AYALA**, investigators would be evaluating stored information from the G.P.S. systems and investigators would not be able to determine which of the several vehicles that **RUBIO-AYALA** had actually been driving. The information obtained would provide probable but not specific locations where **RUBIO-AYALA** has been. This information would still not provide investigators with confirmed locations **RUBIO-AYALA** had been and would leave investigators attempting to identify co-conspirators and their involvement in the organization.

**Cooperating Individuals**

159.   To this point confidential sources have provided information regarding the structure and modes of operation of the organization regarding **RUBIO-AYALA**, but no information has been received specifically about the SOS of the methamphetamine and the specific details about the conspiracy to ensure successful prosecution of all of the main co-conspirators.   To date, no additional cooperating individuals or confidential sources have been identified or have come forward to further this investigation and investigators have no reason to believe that any will become available.  The information provided at this time is not sufficient information by itself, to ensure the dismantling of the organization and the successful prosecution of all of its members. To date, no additional cooperative individuals have made themselves available to the agents.   The fact that the chances are so remote of introducing an additional confidential sources to members of this narcotic trafficking organization, makes it all the more imperative to employ alternative investigative techniques, such as the interception of wire communications.

**Use of Grand Jury Subpoenas**

160.   Based upon my experience and conversations with Assistant United States Attorneys for the District of Kansas who have experience prosecuting violations of criminal law, I believe that issuing subpoenas to persons who are believed to be involved in this conspiracy and compelling them to testify before the Federal Grand Jury would most likely not be successful in achieving the stated goals of this investigation.   Should the targets of this investigation, their co-conspirators and other participants be called to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. It would then be unwise to seek any kind of immunity for any of these persons because the granting of such immunity might foreclose prosecution of the most culpable members of this conspiracy and could not ensure that such immunized witnesses would provide truthful testimony before the Grand Jury.   Additionally, the serving of the Grand Jury subpoenas upon the targets and/or their co-conspirators would only further alert the targets and/or their co-conspirators to the existence of this investigation, thereby causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, or to otherwise compromise this investigation. To date, grand jury subpoenas have been issued in a limited manner to obtain information while still maintaining the integrity of the investigation.   The

information provided to date has not provided information that in its self would accomplish the objectives as set forth in this affidavit.

**Interviews of Subjects or Associates**

161.  Based upon my experience, I believe that interviews of additional subjects or their known associates would produce insufficient information concerning the identities of all of the persons involved in the conspiracy, the source of the drugs, financing, the location of records, drugs, or other pertinent information regarding the subject crimes.  I also believe that any responses to the interviews would contain a significant number of half-truths and untruths, diverting the investigation with false leads or otherwise frustrating the investigation.  Additionally, such interviews would likely result in non-targeted interviewees alerting the members of the conspiracy, thereby compromising the investigation and resulting in the possible concealment, movement or destruction of documents, narcotics contraband, monies, and/or other evidence. There have been individuals arrested in connection with this organization. Though individuals have been approached to cooperate and additional individuals could be approached to cooperate, they are unable to provide any current information concerning this organization.  Based on information obtained from cooperating individuals, some of these individuals are still in contact with members of the

organization and could alert members of the organization to the existence of this investigation if approached.

162.    In this investigation, I believe that these cooperating defendants are not capable of providing agents and officers with ongoing and current information regarding this narcotic trafficking/money laundering organization. Therefore, there is presently no possibility of obtaining significant intelligence information from those defendants. In the event that any of the other arrested subjects did begin cooperating with agents, it is highly unlikely that their knowledge of this narcotic trafficking/money laundering organization would be of significant impact.

**Pen Registers/Toll Analysis**

163.    As stated above, toll analysis for (785) 506-2015 was conducted from November 15, 2008, through November 21, 2008, the time period that agents have identified while **RUBIO-AYALA** is the primary user of (785) 506-2015. During that time frame, (785) 506-2015 placed/received approximately 507 telephone calls. (785) 506-2015 placed/received approximately 41 telephone calls to/from telephone number (620) 282-3514 (Target Phone 4), which is subscribed to Maria VASQUEZ, and utilized by **Adan MOLINA**. As shown herein, **MOLINA** and **RUBIO-AYALA** are close co-conspirators in the trafficking of controlled substances and numerous of

these telephone calls are mentioned herein.  It is noted that on November 26, 2008, at 11:21 p.m., **MOLINA** spoke with **HEATH** on telephone number (620) 282-3514 (Target Phone 4), and **MOLINA** stated "I'll call you tomorrow from a new number." There has been no further meaningful contact to or from (620) 282-3514 (Target Phone 4) and agents stop monitoring it on December 2, 2008. (785) 506-2015, further had contact on 19 occasions with Mexico based telephone numbers.  Mexico is a source country for methamphetamine, cocaine and marijuana.  Additional toll analysis indicates  (785) 506-2015, 14  telephone contacts with Denver, Colorado-based telephone number.  **NUNEZ**, a co-conspirator, has stated that he has a SOS in Denver, and **MOLINA** has had conversations with a drug courier who is presently using a Colorado-based telephone number, the last known contact between **MOLINA** and said drug courier being on November 20, 2008.

164.  On December 3, 2008, after identifying **RUBIO-AYALA's** new telephone number, **(913) 596-0014 (Target Phone 6)**, agents requested subscriber and phone tolls for **Target Phone 6**. Agents received the data during the late-afternoon hours of December 3, 2008, and identified **Target Phone 6** as a **pre-paid T-Mobile cellular telephone with IMSI # 310260904571197, which is subscribed to Omar HERNANDEZ at 2004 N. 51, # 6, Kansas City, Kansas**. As shown herein, **RUBIO-AYALA** has been identified as the primary user of **Target Phone 6**.  Phone

toll analysis of **Target Phone 6** identified that **RUBIO-AYALA**, using **Target Phone 6**, had made/received a total of 241 telephone calls between November 25, 2008, and December 1, 2008 (the last date of toll information). These 241 telephone calls were with a total of 36 different telephone numbers, 35 of the telephone numbers being in the United States and one (1) telephone number being a Mexico-based telephone. Of the 35 different telephone numbers contacted in the United States, agents identified four (4) telephone numbers from the phone tolls analysis of Target Phone 6 that agents have been able to identify as previously being intercepted during authorized interception as described above in the affidavit. Those telephone numbers are: (785) 969-6163, subscribed to by Banuelos R. FIGUEROA at 3711 S.E. 30th Terrace, Topeka, Kansas, with 30 contacts between November 25, 2008, and December 1, 2008 (last date of contact); (785) 207-6990 identified as a Tracfone with no subscriber information with 13 contacts between November 26, 2008, and December 1, 2008 (last date of contact); (785) 438-8757 a pre-paid telephone identified during the authorized interception of Target Phone 4 as being utilized by **Gary HEATH** with four (4) contacts between November 27, 2008, and November 28, 2008 (last date of contact); (785) 640-1617 (Target Phone 5), subscribed to by **Francisco NUNEZ** at 2025 S.E. Ohio, Topeka, Kansas, with one (1) contact on November 27, 2008 (last date of contact).

165.   Additionally, agents identified seven (7) phone contact between **Target Phone 6** and two (2) different Missouri-based telephone numbers on November 29, 2008 (last date of contact); three (3) contacts with two (2) different Georgia-based telephone numbers between November 28, 2008, and November 30, 2008 (last date of contact); three (3) contacts with two (2) different California-based telephone numbers between November 27, 2008, and December 1, 2008 (last date of contact); one (1) telephone contact with a Colorado-based telephone on November 29, 2008 (last date of contact); one (1) telephone contact with a New Jersey-based telephone number on November 26, 2008 (last date of contact); and three (3) contacts with a Mexico-based telephone number on November 27, 2008 (last date of contact). The remaining telephone contacts are with Kansas-based telephones between November 25, 2008, and December 1, 2008 (last date of contact).

166.   The use of pen registers and toll analysis in this investigation has been successful in aiding in the identification of conspirators and the telephone numbers and addresses associated with the named interceptees. At this time, this investigation has not identified all residences or telephones utilized by members of this narcotic trafficking organization in Topeka, Kansas, or other locations.  Moreover, the mere fact that the named interceptees and their associates are known to communicate on the telephone does not provide complete evidence of the crimes, which they are

suspected of committing and the content, and purpose of such phone calls. Without the interception of wire communications, the full scope and activities of the organization cannot be discovered. In this particular investigation, individuals in this organization are utilizing pre-paid cellular phones and are not required to provide any name for the account. Subpoena's were issued for several significant numbers, but due to the fact that individuals in this organization are using pre-paid phones; they are not required to provide any or accurate subscriber information. Therefore identification of these individuals is not possible, without intercepting wire communications.

**Search Warrants**

167.   The use of search warrants as an investigative tool often provides good evidence of the crimes being committed and enables agents to identify the perpetrators of the crimes. However, in this investigation, agents have not yet been able to identify and locate all of the members of this organization in the Topeka area or in other locations. Even if agents identified key locations or residences used by this organization, I believe that law enforcement action, such as search warrants, taken against one member of the organization will have an effect on all other members of the organization. The execution of search warrants would also notify

co-conspirators of the investigations being conducted by law enforcement. If law enforcement did not obtain sufficient evidence during the course of the search warrants co-conspirators would be alerted to the active investigation and may change their methods of distribution of controlled substances and the concealment of assets making it even harder for law enforcement to dismantle the organization as a whole. Therefore, to successfully identify and dismantle the entire organization, it is preferable to delay any search warrants until agents are prepared to arrest all of the key members of the organization.  Moreover, while search warrants may be used in this investigation if a situation occurs which requires such immediate action, the use of search warrants alone would not, provide complete evidence of the activities.

**Wire Communication Intercepts**

168.   It is my belief, based upon all of the above, that the interception of wire communications are the best techniques with a reasonable likelihood of securing evidence necessary to prove beyond a reasonable doubt that the named interceptees, and others unknown, are engaged in the above described offenses.  A complete review of the fruits of prior wire communications which have been monitored are fully contained herein.

## MINIMIZATION

169.   In order to avoid interception of any privileged communications, the monitoring personnel will be instructed to minimize conversations between the named interceptees, or others, and counsel, if any, which pertain to strategy or conduct of any trial or otherwise privileged communications.   If a privileged communication is intercepted, such interception will be minimized and the monitoring personnel will enter in the logs, which will be kept pursuant to monitoring, a notation that the communication was minimized.   The supervising attorney will be immediately notified of the interception.

170.   All interceptions will be minimized in accordance with Chapter 119 of Title 18, United States Code. It is anticipated that the monitoring location will not be staffed at all times, but will be activated electronically.   The monitoring location will be kept secure and access will be available only to persons authorized to be involved with this investigation. If the wire communication is minimized, the monitoring agent will spot check to ensure that the conversation has not turned to criminal matters.

## PERIOD OF INTERCEPTION

171.   It is believed that the facts stated herein establish that the named interceptees and others yet unknown are engaged in an ongoing criminal enterprise

and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the object of this request. Therefore, it is requested that the Court order that the interceptions need not terminate when the communications described herein are first intercepted, but may continue until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation and the various activities in which they are engaged in furtherance of the enterprise, not to exceed a period of thirty (30) days from the date this Order is entered.

172.   It is further requested that the time set forth in the order run from the earlier of the day on which the investigative or law enforcement officer first begins to conduct the interception pursuant to the Court's Order, or ten days from the date of the Order, whichever is earlier.

**AUTHORIZATION REQUESTED**

173.   Therefore, your Affiant submits that probable cause exists to believe that **(913) 596-0014 (Target Phone 6)** is being used and will continue to be used in the importation, distribution and sale of controlled substances and, in this particular investigation, money laundering by the named interceptees and others yet unknown in violation of Title 21, U.S.C., Sections 841, 843(b), 846, 848, and money

laundering, and aiding and abetting, and conspiracy to do the same in violation of Title 18, U.S.C., Sections 1956 and 1957 and 2.

174.   IT IS HEREBY REQUESTED that an Order be issued authorizing the Special Agents of the Drug Enforcement Administration, agents of the Kansas Bureau of Investigation, Officers of the Topeka Police Department, Shawnee County, Kansas, Sheriff's Department and other authorized individuals to intercept and record the wire communications to and from **(913) 596-0014 (Target Phone 6)**.

175.   IT IS FURTHER REQUESTED that this Affidavit, the attached Application, the resulting Order and Order to Service Provider, and all reports submitted pursuant to this Order be sealed until further order of the Court.

176.   IT IS FURTHER REQUESTED that the Order authorizing the interception of wire communications occurring not only to or from **(913) 596-0014 (Target Phone 6)**, but to any other telephone numbers accessed through the above-referenced International Mobile Subscriber Identity (IMSI) number, and to any other International Mobile Subscriber Identity (IMSI) numbers accessed through the target telephone number referenced above within the thirty (30) day period.

177.   Intercepted conversations will be recorded by way of computer and all text will be securely preserved.  Electronic intercept logs will be prepared regarding the date and time of calls, the particulars involved, and the subject of the intercept.

In a timely manner the interception records will be printed, reviewed, and all intercepts found to be non-pertinent will be sealed.   At the conclusion of the intercepts, the sealed interception records will be presented to the Court and sealed in accordance with the Court's instructions.   Reports detailing the course of the interception will be filed with the Court on or about the tenth, twentieth and thirtieth days following the commencement of interception pursuant to the Court's Order.

FURTHER, AFFIANT SAITH NAUGHT.


Doug Garman
Task Force Agent
DEA


Sworn before me on this ___10th___ day of December, 2008.


HON. RICHARD D. ROGERS
Senior United States District Judge
District of Kansas


Final approved by OEO ___12/10/08___